[Crim. No. 39804. Second Dist., Div. Five. Jan. 6, 1984.]

THE PEOPLE, Plaintiff and Appellant, v.
J. DAVID KANE et al., Defendants and Appellants.

COUNSEL

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General,

Carol Wendelin Pollack and Christine C. Franklin, Deputy Attorneys General, for Plaintiff and Appellant.

Robert B. Le Corvec, Marilyn Garber and Steve R. Riskin for Defendant and Appellant.

## Opinion

**STEPHENS, Acting P. J.**—This appeal was determined by this court on September 14, 1982.[1] Thereafter, the Supreme Court granted a hearing since one of the issues involved was before that court in *People* v. *Wolcott* (1983), now reported in 34 Cal.3d 92 [192 Cal.Rptr. 748, 665 P.2d 520]. Following the decision in *Wolcott,* the instant case was returned to this division for consideration in light of *Wolcott.* We adopt all portions of the initial opinion except as to the contention that the court erred by allowing counts I and III (as renumbered) to be amended from charges of robbery to assault with a deadly weapon.

Early in the evening of August 22, 1980, Mary Kennedy and Yolanda Angue had gone to a small gathering at the Smith residence in Baldwin Hills. Somewhat less than 10 guests, including Theodore Willis and John Lewis, who lived with the Smiths, were there.

Around 11:30 p.m., as Mr. Lewis, Ms. Kennedy and Ms. Angue were leaving the house, three armed and masked men[2] confronted them, ordering them to return inside. One of the gunmen, later identified as appellant Kane, was carrying a sawed-off rifle and was wearing light clothing, while Latel carried a smaller gun (later found to be a pellet gun) and wore dark clothes.

Kane pointed his weapon at Mr. Willis' face and ordered him to lie on the dining room floor with Mr. Lewis, Ms. Kennedy, Ms. Angue and a Nancy Vasquez.

---

[1]This division recognizes the analytical work done on this case by Judge Eric Younger of the Los Angeles Superior Court during the period he sat in this court by assignment of the Chairperson of the Judicial Council.

[2]Both men initially wore stockings as masks. Latel was still wearing a stocking when he forced Ms. Kennedy at a later time to undress but she was able to see his features under the stocking at that time. In addition, Mr. Willis and Ms. Angue thereafter saw both appellants without the masks, and Ms. Kennedy saw coappellant Kane thereafter without a mask. Mr. Willis and Ms. Kennedy made photographic identifications of both appellants shortly after the incident. They also identified coappellants at the preliminary hearing and at trial. Ms. Angue identified coappellants at the time of their arrest and at trial.

Kane stood over them with his gun until Latel came into the room, the latter pushing Mr. Lewis's head down and demanding to know where the money and "stuff" were. Lewis twice replied that he didn't know and Latel struck him with his gun butt, causing profuse bleeding.

Meanwhile, Latel removed the contents of Ms. Kennedy's and Ms. Angue's purses and took Mr. Willis' wallet from him, throwing it on the table where Kane then went through it. At least two of the three victims were ultimately missing various items of property.

Latel then took Ms. Kennedy to the den and ordered her to disrobe, which she did. Ms. Vasquez was also brought in and given the same instructions; she refused and was slapped against the wall. Two children (nieces of the Smiths) were then discovered hiding behind the door and Latel threatened to beat them if Ms. Vasquez did not undress.

But they were interrupted, as a light began flashing outside and a helicopter was heard overhead. The various victims were herded into the master bedroom (except for Ms. Kennedy, Ms. Vasquez and one of the little girls, who had hidden in the den closet).

Kane then told Ms. Angue that she was going to help him and Latel escape. They had removed their masks by that time and left the house, but were confronted by Sergeant Wilson, to whom Ms. Angue ran, screaming. Wilson placed Latel and Kane[3] under arrest, but Angue told him hysterically that there were victims and perhaps one or two additional gunmen inside.

In the meantime, deputy sheriffs, who had received radio calls about the masked gunmen, had surrounded the house and announced through a bullhorn that the occupants should come out with their hands up.

Both Mr. Willis and Ms. Kennedy later indicated that they had heard the announcements but remained in the house out of fear of being shot in the confusion.

A Deputy Fredericks had positioned himself near a window to try to see into the house and managed to grab one of the little girls, pulling her out of the window. Shortly thereafter, the deputies decided to storm the house,

---

[3]Latel and Kane are occasionally hereinafter referred to collectively as "appellants" notwithstanding the fact that the People have also appealed portions of the trial court's orders (granting new trials).

not knowing who—whether victims or suspects—remained inside.[4] In fact, there were no remaining suspects, though a review of the record makes it clear that no deputy or victim knew there were none. The various hiding victims were discovered, as were the two previously mentioned weapons and stockings.

Following the granting of various motions pursuant to Penal Code sections 995 and 1118.1 (*infra*), both appellants were convicted by a jury of count II (the robbery of Mr. Willis) and counts I, III, V and VI (assaults with a deadly weapon against victims Lewis, Vasquez, Kennedy and Willis).[5] In addition, Kane was convicted of violating the Deadly Weapons Control Law (Pen. Code, § 12020, subd. (a)), count IV.

■ Appellants' customary assertions of insufficiency of the evidence may be summarily dismissed. While any factual scenario, described from a number of different people's points of view, is going to vary in some respects, whether at a criminal trial or elsewhere, this one[6] certainly included ample evidence from which a reasonable trier-of-fact could render the aforementioned verdicts. (*People* v. *Johnson* (1980) 26 Cal.3d 557 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

Similarly, we will be brief in our analysis of appellants' claim that they were the victims of unreasonable searches and seizures. Counsel sometimes seem to feel it their duty, under today's California law to raise even the most bizarre theories, as both have managed to do regarding the search in the instant case.[7]

■ Appellants, whose sole claim to dominion and control over the premises was gained by armed attack, seem to feel that they have standing to

---

[4]Deputy Horeczky could overhear Ms. Angue screaming to Sergeant Wilson over the latter's radio and testified essentially that all the involved deputies assumed there could be additional suspects inside. Wilson also so advised him, and the deputies' preparations to enter clearly demonstrate that they believed the information.

[5]While the evidence seems to show a robbery of Ms. Angue, and other possible allegations, these were not pled.

[6]The factual narrative herein is drawn from the testimony of various witnesses at the trial; there were no significant discrepancies between prosecution witnesses as to the events set forth. The appellants' version, i.e., that the events had happened but that others were the perpetrators and that they (appellants) were innocent party guests, was simply rejected by the jury based on its view of the substantial evidence supportive of the prosecution version.

[7]We find nothing in the cases on the duties of counsel which commends the raising of absurdities and, as any experienced trial lawyer knows, one can only go to the intellectual credibility well so often before he runs the risk of it being dry for his best arguments. Neither *Anders* v. *California* (1967) 386 U.S. 738 [18 L.Ed.2d 493, 87 S.Ct. 1396]; *People* v. *Wende* (1979) 25 Cal.3d 436 [158 Cal.Rptr. 839, 600 P.2d 1071], nor *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1], suggest the desirability of raising specious issues especially where, as here, there are several bona fide ones.

assert that the officers should have had a warrant to enter. After all, they point out, the place was surrounded; why not go and get a warrant before entering?

We choose to assume counsel's argument is not serious and note, as politely as possible, that there were what the cases might call "exigent circumstances" for an entry without a warrant.[8] (*People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333], cert. den. (1976) 429 U.S. 929 [50 L.Ed.2d 299, 97 S.Ct. 335]; *Vale* v. *Louisiana* (1970) 399 U.S. 30 [26 L.Ed.2d 409, 90 S.Ct. 1969]; *People* v. *Hill* (1974) 12 Cal.3d 731, 753 [117 Cal.Rptr. 393, 528 P.2d 1]; *People* v. *Amaya* (1979) 93 Cal.App.3d 424 [155 Cal.Rptr. 783] [and cases cited at p. 428].)

Appellants more substantial claims of error deal with the following issues:

1. Admitting appellants' statements to the deputies into evidence;

2. Precluding impeachment of a witness with a prior felony conviction;

3. Amendment of the weapons charge;

4. Giving an instruction on falsehood as indicative of consciousness of guilt;

5. Amending two robbery counts to charge assault with a deadly weapon as lesser included offenses.

Additionally, the People have appealed the trial court's granting of a motion for new trial with respect to the convictions on those assault with a deadly weapon counts which were reductions from robbery counts to the robbery counts I and III.

### Discussion

We will take up each point in the aforementioned order.

#### 1. *Admitting Appellant's Statements to the Deputies Into Evidence*

Following the defense[9] accounts of the evening, Deputy Winegar, a detective, was called to testify by the People on rebuttal. He testified to ad-

---

[8]As the attorney general did not raise the issue, we should perhaps not dwell on the rather substantial evidence of not only "consent" but, doubtless, extreme enthusiasm which would have greeted the deputies' quite possibly lifesaving arrival (and presumably the attendant search) on the part of everyone who had any lawful or apparent control over the premises.

[9]Neither appellant testified personally in the jury trial but Latel offered several witnesses to his version of the events; both appellants testified outside the presence of the jury that they made no statements to Winegar.

vising each appellant of his *Miranda* rights and to taking a statement from each.

The statements, while exculpatory in form, were damaging to each appellant because of their inconsistency with each other and with the defense trial testimony.

■ The People must, of course, establish the voluntariness of any accused's statement beyond a reasonable doubt, but the trial court's resolution of conflicts in the evidence must be upheld unless it is "palpably erroneous." (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 608 [147 Cal.Rptr. 172, 580 P.2d 672]; *People* v. *Midkiff* (1968) 262 Cal.App.2d 734, 739 [68 Cal.Rptr. 866], and cases cited therein.)

Here, Deputy Winegar testified unequivocally that he advised both appellants of their constitutional rights, and each stated that he understood his rights, did not want an attorney, and desired to make a statement. The trial court totally disbelieved appellants' assertions that they refused to make statements to Winegar and accepted the deputy's version of the conversation.

Nothing in the record suggests error in the trial court's ruling on this credibility issue.

### 2. *Precluding Impeachment of a Witness With a Prior Felony Conviction*

James Henry Atkinson was a very minor witness for the People, simply enough, because he was in the rear of the house when the robbery began, became aware something was wrong and escaped. His testimony can be summarized as merely cumulatively corroborating the occurrence of the first moments of the robbery. He could identify no one and would be judged lucky in making his escape save for the fact that he accomplished it through a window and broke his ankle.

■ The trial court forbade appellants' trial counsel to impeach Atkinsons's testimony with evidence of a 1972 felony conviction of the "Mann Act," generally defined as "taking a woman across a state line for immoral purposes." (18 U.S.C. § 2421.)

While we do not minimize the gravity of that offense, it plainly does not involve the "honesty" issues required for admissibility under Evidence Code section 352 under the doctrine of *People* v. *Spearman* (1979) 25 Cal.3d 107, 114 [157 Cal.Rptr. 883, 599 P.2d 74]; see *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1].

While the *Beagle* guidelines for excluding evidence of a *defendant's* prior convictions are not precisely applicable to convictions offered against a witness other than the defendant, they should be considered. (*People* v. *Banks* (1976) 62 Cal.App.3d 38, 47 [132 Cal.Rptr. 751].)

Here, the trial court was clearly correct in precluding admission of such evidence.

In any event, Kane's trial counsel actually asked Atkinson if he had a prior conviction without a prior determination of the admissibility of the conviction by the trial court. The trial court, while not holding counsel in contempt, chastised him severely.

Even if we felt the trial court erred, which we do not, Atkinson was a *very* minor witness and any error would have been harmless beyond the test set forth in *People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243], cert. den. (1957) 355 U.S. 846 [2 L.Ed.2d 55, 78 S.Ct. 70].

### 3. *Amendment of the Weapons Charge*

While we generally refer to the subject portion of Penal Code section 12020 as possession of a sawed-off shotgun, subdivision (d)(1) actually defines a "sawed-off shotgun" to include ". . . any weapon made from a rifle or shotgun [whether by manufacture, alteration, modification, or otherwise] if such weapon as modified has an overall length of less than 26 inches."

The court took judicial notice (by actual measurement) that the rifle was less than 26 inches in total length.

Appellant Kane was initially charged with the subdivision's first definition, i.e., a firearm able to fire shotgun ammunition though there was, at trial, a failure of proof on this issue.

Appellant Kane asserted at trial that it was necessary to show conversion to shotgun ammunition use, a requirement of definition number 1, as to definition number 3 also. Such an assertion, however, simply misreads the statute and attributes to definition number 3 a requirement that is not included in its language. The trial court properly concluded that no showing of conversion was necessary.

The parties and court spent considerable time discussing the probity of language for an amendment and the propriety of the amendment itself.

As to the first issue, the Legislature caused the problem by decreeing that a "rifle," for some reason best known to the draftsmen of section 12020,

subdivision (d) (1) is occasionally a "shotgun." While we don't claim the wisdom to fully understand the ontological issues, the trial court correctly, in instructing the jury, deleted the word "rifle" and added "shotgun" because it correctly realized that the charge itself was possession of a sawed-off shotgun and that term was thereafter defined as a rifle having an overall length of less than 26 inches.

The amendment was proper under Penal Code section 1009, which permits cure of a "defect or insufficiency, at any stage of the proceedings . . ." so long as no new offense is charged. *Patterson* v. *Municipal Court* (1971) 17 Cal.App.3d 84, 88 [94 Cal.Rptr. 449], reminds us that the line of notice in criminal pleading (Pen. Code, § 952) is crossed only when "the amendment changes the offense charged to one not shown by the evidence taken at the preliminary examination." (*People* v. *Valles* (1961) 197 Cal.App.2d 362, 371 [17 Cal.Rptr. 204].)

The amendment here, really just changing the terminology for what was always, after all, the same gun, was properly allowed.

*4. Giving an Instruction on Falsehood as Indicative of Consciousness of Guilt*

■ The trial court gave the jury CALJIC No. 2.03 (1979 rev.) over a timely defense objection: "If you find that before this trial [a] defendant made false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt but it is not sufficient of itself to prove guilt. The weight to be given to such a circumstance and its significance, if any, are matters for your determination."

It should be noted, at the outset of this discussion, that the sole evidence calling for this instruction was Deputy Winegar's *rebuttal* testimony about appellant Kane's pretrial statement to him which was (i) exculpatory but (ii) inconsistent with the defense (i.e., that Kane and Latel were *victims* rather than perpetrators) offered by the various defense witnesses.

Absent the protested instruction, the jury would have *no* guidance from the court as to the effect of this significant rebuttal evidence. While this circumstance is unusual, it arises from the coincident facts that Kane didn't testify at trial (making CALJIC Nos. 2.13 and 2.20's general treatment of prior inconsistent statements of a witness inapplicable) and that his statements to Winegar were exculpatory (making CALJIC No. 2.71, on admissions, of marginal value to the jury, notwithstanding its legal propriety).

It is important to recognize what issue we *do not* analyze in the instant situation: This is *not* a case where a defendant's prior out-of-court exculpatory statement is merely *inconsistent with People's witnesses* at trial. Giving CALJIC No. 2.03 in that latter circumstance has been held error in *People* v. *Rubio* (1977) 71 Cal.App.3d 757 [139 Cal.Rptr. 750]; *People* v. *Morgan* (1978) 87 Cal.App.3d 59 [150 Cal.Rptr. 712], deals more with the admission of evidence and, while it has a logical bearing on the issues here, it is, in no sense, controlling on the *instruction* issue.

The Supreme Court's 1980 opinion in *People* v. *Green*, 27 Cal.3d 1, 40 [164 Cal.Rptr. 1, 609 P.2d 468], puts this issue to rest. Justice Mosk notes therein that the testimonial situation, in which the defendant did *not* testify at trial and where *other* witness' testimony cast doubt on his out-of-court exculpatory statement to the police, presented none of the risks underlying the *Rubio* rule. The instant case is perhaps stronger for the Supreme Court's point in *Green* than its own facts were, as here much of the discrediting testimony came from defense witnesses. (See *People* v. *LaSalle* (1980) 103 Cal.App.3d 139 [162 Cal.Rptr. 816].) To the extent that the reasoning in *Morgan* could be seen as inconsistent, for our purposes, with *Green,* it is, of course, overcome by the more recent Supreme Court pronouncement.

There was no error in the instruction.

5. *Amending Two Robbery Counts to Charge Assault With a Deadly Weapon as Lesser Included Offenses*

Appellants contend that the trial court, on a Penal Code section 1118.1 motion at the conclusion of the People's case, erroneously amended counts I and III to charge assault with a deadly weapon (hereinafter ADW).[10] They argue that it is not a lesser included offense in robbery and that the "use" enhancement (Pen. Code, § 12022.5) of the robbery charge cannot be considered in determining the validity of the lesser included offense.

The question of whether or not assault with a deadly weapon is indeed a lesser and necessarily included offense when a robbery count includes a "use" allegation was settled by our Supreme Court in *People* v. *Wolcott, supra,* 34 Cal.3d 92. At page 101 the court stated: "We therefore adhere to the majority view that an allegation of firearm use under [Penal Code] section 12022.5 should not be considered in determining lesser included offense. Language to the contrary in *People* v. *McGreen, supra,* 107

---

[10]Appellants' arguments, as to the several ADW charges, that pointing guns at the victims lacked requisite criminal intent are, in the context of this case, specious.

Cal.App.3d 504 [166 Cal.Rptr. 360], and *People* v. *Myers, supra,* 125 Cal.App.3d 735 [178 Cal.Rptr. 259] is disapproved." It is unnecessary for us to restate the *Wolcott* analysis here. Suffice it to say that assault with a deadly weapon is not a necessarily included offense under the charges filed in counts I and III of this information.

Thus, although the court actually amended counts I and III to charge assault with a deadly weapon, in doing so it did not exercise that discretion required by the "permit[ing] of an amendment" as provided for in Penal Code section 1009. The trial court carefully specified that the amendments were made solely in compliance with appellate court decisions holding that assault with a deadly weapon was a lesser included charge where use of a gun was also alleged. In fact, the court felt so strongly about the perceived erroneous compulsion by higher court decisions, which it believed to be erroneous, that it announced that a new trial on those counts would be granted, and in fact it was. Because the court did not in fact exercise its discretion and, under *Wolcott,* the ADW was not a necessarily included offense, the amendment of counts I and III was error. This error was made moot by the granting of a new trial on those counts.

The People have appealed from the granting of the new trial but argue only the issue now settled by *Wolcott.* We affirm the granting of the new trial because *Wolcott* has now taught us that the jury in this case was "misdirected in a matter of law" (Pen. Code, § 1181, subd. 5.)

The judgments of conviction in counts II, IV, V and VI are affirmed. The granting of the new trials in counts I and III are affirmed.

Ashby, J., and Hastings, J., concurred.