[No. E006835. Fourth Dist., Div. Two. Oct. 2, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDRES ALVARES GARCIA, Defendant and Appellant.

COUNSEL

Howard C. Cohen, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Robert M. Foster and Carl H. Horst, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**HOLLENHORST, Acting P. J.**—A jury convicted Andres Alvares Garcia of four counts of grand theft (Pen. Code, § 487), six counts of filing a false

document with the court (Pen. Code, § 115), and one count of conspiracy (Pen. Code, § 182). He was sentenced to prison and appeals, claiming his cross-examination of a key prosecution witness was improperly curtailed, there was insufficient evidence to support the false filing counts, and his conviction of four counts of grand theft should be reduced to one. We reject his contentions and affirm.

## FACTS

Garcia worked as a bail bondsman for Jiminez Bail Bonds in Indio. Jiminez was owned by Tony Jiminez, who also owned Capital Bond and Insurance Company, the surety for Jiminez Bail Bonds. Tony's brother, Tom, who died some time before this trial, ran Jiminez Bail Bonds. Tom and Garcia together wrote bonds that had not been originally issued by Capital, as they should have been. They failed to report the bonds to Capital and did not forward to the surety a percentage of the premiums they collected for issuing the bonds. When the bonds began "going bad," Tony was notified by the court and he had the district attorney's office begin an investigation which culminated in these charges. During the time Tom and Garcia were writing the bonds, Tom leased a Cadillac for Garcia.

### 1. *Limitation of Cross-examination*

 Garcia claims his cross-examination of a prosecution witness was improperly curtailed by the court. The witness testified on direct that she had worked for Garcia for about two months during the end of 1985. She drove his car, a Cadillac, for him at night when he was posting bonds because he had problems with night blindness. In exchange for this, he paid her rent and all her bills, and gave her money whenever she needed it. She said he always carried large sums of money. She once saw him change the amount of a bond by using white-out. She claimed that on one occasion, he sent her to retrieve a bond out of the trunk of his car and she saw a one-inch-thick stack of bonds inside, some of which were for amounts of $100,000. She testified that when bonds filed in Orange County for $100,000 in the names of Coe and Tepper came back, Garcia told her they were "bogus." Three or four months later, Tom questioned her about the bonds Garcia had written.

On cross-examination by the defense, she testified that Garcia had attempted to take over her life and was jealous of people who visited her at her home. She said she ended her relationship with Garcia because he was very violent and mean and he struck her son. She claimed that Tom once told her that Garcia had spoken to a man who had raped her several years before and had instructed him to contact her and scare her, and because of

this, she disliked Garcia. She also said she was afraid of Garcia because he was big. She admitted receiving welfare assistance while she was working for Garcia. She testified she did not think what Garcia was doing with the bonds was illegal. She reported that while she was living with her mother, people would call her and try to locate Garcia, saying the bonds he issued for them were not good. She said once the Coe twins came to her house and said the bond Garcia issued for them was not good. Garcia then met them there and altered the bond by using white-out. (Presumably, this was the one white-out incident she referred to in her direct testimony.) During this portion of her testimony, she denied knowing anyone by the name of Susan Maxwell. Later, when asked, "Did you ever demand money from Mr. Garcia to keep you from taking action against him?" she responded, "No." To the followup question, "Did you ever tell anyone that unless Mr. Garcia gave you a certain amount of money, you would get him in trouble?" she said, "No."

On redirect, she testified that sometimes Garcia wrote receipts for the bonds he issued and sometimes he did not. Upon recross, she stated that Garcia made money in addition to his salary as a bail bondsman by doing skip tracing.

During the defense case, Susan Maxwell took the stand and testified as follows about the aforementioned prosecution's witness:

"A. . . . She came to my door [with a man] and identified herself.

"Q. And under what circumstances?

"A. She was looking for Mr. Garcia. And she wanted to know if he was there, and I told her no. And she was extremely upset. And she said, 'Well, I have a message for him.' And she said, 'Just a minute. I have someone else who is going to help me deliver it.'

"Q. Did she make demand herself with the assistance of this gentleman for some funds from Mr. Garcia?

"A. Yes. I think his presence was to probably intimidate me more than anything else. He did tell me that he was sure I understood what he was there for. She told me that unless [Garcia]—

"[THE PROSECUTOR]: Objection.

"THE WITNESS: —brought her $60,000.

"THE COURT: Sustained.

"Q. BY [DEFENSE COUNSEL]: [The prosecution witness] told you something about $60,000?

"[THE PROSECUTOR]: Objection, your Honor. Calls for hearsay."

■ ■■■ In response to the prosecutor's objection, defense counsel argued the testimony was a prior inconsistent statement of the prosecution witness.[1] The trial court sustained the People's objection.[2] The testimony then resumed as follows:

"Q. . . . Do you know if [the prosecution witness] had a rift with Mr. Garcia?

"A. She said she did.

"· . . . . . . . . . . . . . . . . . .

"Q. Do you know if [the prosecution witness] was biased against Mr. Garcia in any way?

"THE WITNESS: Yes.

"· . . . . . . . . . . . . . . . . . .

"Q. . . . Do you know whether [the prosecution witness] had a reason for wanting to get even with Mr. Garcia?

"· . . . . . . . . . . . . . . . . . .

"THE WITNESS: Yes.[3] "

---

[1] Although, on appeal, Garcia urges that the statement was nonhearsay operative facts, this ground was not urged below and therefore may not be argued on appeal.

[2] During a later discussion outside the presence of the jury, defense counsel represented to the court that he had asked the prosecution witness if she had ever been to Maxwell's house and if she had ever attempted to extort funds from Garcia by asking Maxwell or telling Maxwell that she wanted funds from Garcia. The court said it could not recall the latter question being asked, adding that if it had, the prior inconsistent statement would then be admissible. The court asked the reporter to search the record for such a reference. Unfortunately, the court directed the reporter to look at the transcript for the wrong day and ultimately, the reporter stated she could find no such reference. Of course, as the excerpt of the record quoted in the text demonstrates, no such specific questions were asked of the prosecution witness.

[3] During rebuttal, Maxwell's veracity was impeached by evidence that Garcia signed a lease for Maxwell and her children, and, contrary to her testimony, her rent was not paid by Tom, but was tendered in cash or by money order. An investigator from the district

 Evidence Code section 770 provides for the admission of a prior inconsistent statement of a witness where "[t]he witness was so examined while testifying as to give him an opportunity to explain or deny the statement . . . ."[4] Unfortunately, there has not been an overabundance of cases construing the meaning of "an opportunity to explain or deny the statement" and those that have leave a good deal of room for us to decide the current matter.

The most recent pronouncement on the subject is in *Bossi* v. *State of California* (1981) 119 Cal.App.3d 313 [174 Cal.Rptr. 93], and while we recognize that this is a civil case, still, it attempts to give meaning to the somewhat vague phrasing of Evidence Code section 770. In *Bossi*, the court concluded that handing a witness the 60-page transcript of a deposition taken of him 18 months earlier and asking him, " 'Now, at that time and place, were all of these questions asked and all of these answers given?' " was an insufficient foundational question for admission of statements contained in the deposition transcript because it did not afford the witness "a realistic opportunity to explain or deny any specific statement contained therein." (*Bossi* v. *State of California, supra,* 119 Cal.App.3d at p. 325.)

In *People* v. *Morgan* (1978) 87 Cal.App.3d 59 [150 Cal.Rptr. 712], disapproved on other grounds in *People* v. *Kimble* (1988) 44 Cal.3d 480, 498 [244 Cal.Rptr. 148, 749 P.2d 803], and in *People* v. *Kane* (1984) 150 Cal.App.3d 523, 533 [198 Cal.Rptr. 73], the witness made statements inconsistent with her trial testimony during an interview in the prosecutor's office, which she immediately repeated in a taped interview at the police department a few days before she took the stand. The court concluded a sufficient foundation had been established under Evidence Code section 770 when "the prosecutor asked [the witness] if she had not made specific statements in an earlier conversation in the prosecutor's office . . . [and] whether she had such a conversation in the police station . . . . Having been questioned in detail about the first conversation, and having been asked whether the second,

---

attorney's office testified that Maxwell told him that Garcia lived with her and was her boyfriend. A security guard at Maxwell's condominium complex testified that Garcia was a frequent visitor and he had told the guard that he was paying Maxwell's bills. On direct, Maxwell admitted that Garcia paid for her groceries.

[4] The precursor to Evidence Code section 770, Code of Civil Procedure former section 2052, provided that the inconsistent statement must be related to the witness "with the circumstances of times, places and persons present . . . ." Former section 2052 was repealed by the 1965 version of the Evidence Code, which included section 770. Evidence Code section 770 contained many changes, including a lessening of the showing that must be made in order to introduce the inconsistent statement. However, the foundational requirement was not completely obliterated, as one author put it, "It would now seem that a satisfactory foundation can be achieved by describing the occasion of the alleged prior statement to the witness in any manner that adequately served to refresh his memory." (Note, *Modification of the Foundational Requirement for Impeaching Witnesses: California Evidence Code Section 770* (1966) 18 Hastings L.J. 210, 217.)

tape-recorded conversation, was the same as the first, the witness . . . was given adequate opportunity to explain or deny making the tape-recorded statements within the meaning of Evidence Code section 770 . . . ." (87 Cal.App.3d at pp. 71-72.)

In *People* v. *Strickland* (1974) 11 Cal.3d 946 [114 Cal.Rptr. 632, 523 P.2d 672], the witness's trial testimony that the victim was already dead when he and the defendant entered the home in which the victim was present was contradicted by his earlier tape-recorded statement to the police that the defendant raised his voice to the victim when the former entered the house and the witness smelled fresh gun powder when he first went inside. The Supreme Court found a sufficient foundation for admission of the prior inconsistent statement occurred when "the prosecution, in its direct examination of [the witness] . . . ma[de] direct reference to [the witness's] earlier, and tape-recorded, statements to the police. On the stand, responding to such references, [the witness] denied telling the police that . . . upon re-entering the house, he could smell the aroma from a freshly fired gun, and further denied that defendant had suggested the . . . claim, if questioned, that [the victim's] death had preceded the[ir entry into the house]." (*Id.*, at p. 954.)

Finally, in *People* v. *Aeschlimann* (1972) 28 Cal.App.3d 460 [104 Cal.Rptr. 689], the defendant was interviewed by police immediately after bringing his battered infant into the emergency room of a hospital. On cross-examination at trial, the defendant said he could not remember speaking to the officer who was present at the hospital about how his son may have died and he "professed no discussion with [the officer's partner] concerning [the child's] having fallen from a counter." (*Id.*, at p. 474.) The officer's partner, who overheard the conversation between the defendant and the officer, thereafter testified that the defendant said the child had fallen off a counter. The court concluded that under Evidence Code section 770, "[i]t . . . would have been fruitless for the prosecution to interrogate [the defendant] as to the specific statements testified to by the deputy." (*Id.*, at p. 474.)

The foregoing cases all demonstrate essential aspects missing from the circumstances here—that the "realistic opportunity" which must be afforded the witness to explain or deny the statements under section 770 requires reference to *more than one* of the following, 1) the people involved in the conversation, 2) its time and place, or 3) the specific statements that were made during it. The foundational question here, "Did you ever tell anyone that unless Mr. Garcia gave you a certain amount of money, you would get him in trouble?" completely misses the first two categories. Under these circumstances, we believe the trial court acted properly in

refusing to allow defense counsel to introduce the prior inconsistent statement.

Our analysis does not end here, however. Even if, for the sake of argument, we were to conclude the trial court's ruling was incorrect, it must be noted first, that contrary to Garcia's claim on appeal, the prosecution witness's testimony was far from pivotal to the People's case.[5] While it is true that the witness testified that Garcia admitted some bonds were bogus, his statement was in relation to bonds filed in Orange County which were *not* the subject of this action. Her testimony that Garcia had a stack of bonds in the trunk of his car, some of which were in $100,000 denominations, was duplicative of testimony offered by other witnesses that Garcia issued bonds in that amount and by the physical evidence introduced, i.e., the $100,000 bonds themselves which were tied to Garcia. Her testimony that Garcia once whited out something on a bond had no relation to the bonds at issue here and was cumulative of the physical evidence which showed that Garcia whited out at least one of the bonds relevant to this prosecution. Her testimony that Garcia had large sums of money, paid her rent and bills and gave her money when needed for two months was of little prejudicial impact to the defense considering the fact that other evidence showed that Garcia had minimal living expenses[6] while he earned a salary as a bail bondsman, along with "moonlighting" as a skip tracer. The foregoing is the sum total of the witness's testimony against Garcia as solicited by the prosecutor. On cross-examination she revealed her tremendous bias against Garcia, which only served to call her direct testimony into question. Her testimony was far from crucial and depriving the defense of an *additional* opportunity to impeach her was not devastating to Garcia. Moreover, Maxwell did indeed testify that the witness "ma[de] demand herself with the assistance of this gentleman [who came with her to Maxwell's home] for some funds from Mr. Garcia." Thus, the jury learned that the witness attempted to extort money from Garcia and this contradicted her general denial of tell[ing] anyone that unless . . . Garcia gave [her] a certain amount of money, [she] would get him in trouble . . . ." (3) (See fn. 7.) We therefore cannot view this assumed error as prejudicial per se as Garcia urges us to do.[7]

---

[5] We find Tony's testimony far more significant. The prosecutor put it succinctly during argument to the jury when he said, " . . . [T]he case is not based on [her] testimony . . . . [¶] The information that she's telling you we already knew. She amplifies. She puts a bit more in to fill in some of the gaps, but most of the things she said we already knew.

[6] He slept on the couch at the bail bond office, showered at the home of another employee and wore the same casual clothes all the time. The lease payments on "his" Cadillac were made by Tom and there was no evidence Garcia reimbursed him for them.

[7] It is clear that a proper ruling under Evidence Code section 770 does not impact the defendant's due process or confrontational rights. (*People* v. *Strickland, supra*, 11 Cal.3d at p. 954.)

## 2. *Penal Code Section 115 Counts*

■ Garcia argues that the convictions for six counts of violating Penal Code section 115 cannot stand because the bonds in question are genuine. Penal Code section 115 prohibits the filing of "any false or forged instrument . . . which instrument, if genuine, might be filed . . . ."

First, Garcia argues that the bonds are genuine because Tony offered his opinion that if the defendants for whom the bonds were issued ultimately failed to appear in court, Capital would be held liable for the face amount of the bonds.[8] Of course, the jury was free to reject Tony's opinion. Moreover, Garcia ignores the fact that Tony also testified that because Capital was in "conservatorship" it had yet to be determined if it would be held liable on any of the bonds Garcia or Tom wrote.

Garcia then turns to *People* v. *Surety Ins. Co.* (1982) 136 Cal.App.3d 556 [186 Cal.Rptr. 385], a bail bond forfeiture case, to argue that the bonds here are genuine. In *Surety*, the court found the company was not liable on the bond where it had previously revoked the attorney-of-fact's power to issue bonds in its behalf. In rejecting the People's ostensible authority theory of liability, the court noted that there was no evidence that the surety was negligent in allowing the former attorney-of-fact to have access to the bonds he issued. Garcia argues here that Capital was negligent in giving him access to the bonds he wrote. This matter was never determined by the jury here and we are in no position to sit as a trial court. Moreover, Garcia ignores an additional requirement stated in *Surety* for the application of the ostensible authority theory—i.e., that the third person relying on the apparent authority not be guilty of negligence. Again, whether this occurred here was a question of fact not put to this jury and it is beyond the ability of this court to decide. We agree with the People's assessment that Garcia's argument is an unwarranted substitution of the concept of a false or fraudulent document with Capital's ultimate civil liability for the bonds, a matter which is yet undetermined. Tony testified that the bonds in question were "fraudulent." No one contradicted this testimony. The jury was free to accept his statement and to utilize it to make a finding of guilt on each of the Penal Code section 115 counts. Three of the bonds in question were in amounts for which Capital was by law unauthorized to write bonds. We

---

[8] Garcia requests that we take judicial notice of a bond from the collection of 40 which was introduced as evidence at this trial, but did not form the basis for any of the charges here. This bond was eventually forfeited when the defendant failed to appear and the "surety" was held to be liable on it despite the fact that it was irregular. Not only has this court already ruled negatively on Garcia's request that we take judicial notice of the proceedings on this bond, but we note with interest that according to the documents supplied us by Garcia, it was ultimately *Jiminez Bail Bonds* and not Capital, which was held liable on the bond.

view these bonds as similar to a falsified will or deed of trust, whose filing is punishable under Penal Code section 115. (*Generes* v. *Justice Court* (1980) 106 Cal.App.3d 678 [165 Cal.Rptr. 222]; *In re Horowitz* (1949) 33 Cal.2d 534 [203 P.2d 513].)

### 3. *Multiple Grand Theft Convictions*

■ Garcia argues that he should stand convicted of only one count of grand theft instead of four because all the takings were pursuant to one overall scheme or plan. It should be noted at the outset that although the jury convicted Garcia of four counts, he is to serve no time on any of them, as sentence was stayed as to all four under Penal Code section 654.

Garcia contends that the wording of the information shows that the four thefts were in fact only one. He points to the conspiracy count, which alleges as follows: " . . . Garcia . . . did . . . conspire . . . with another . . . to commit the crim*e* of Grand Theft . . . ." (Italic added.) However, the information also alleges, specifically as to the first grand-theft count that, " . . . on . . . March 14, 1986, . . . Garcia . . . did wilfully and unlawfully take . . . the property of Randall Mitchell, Paula Cross *and* Capital Bond and Insurance Company." (Italics added.) As to the second, the information states, " . . . on . . . February 26, 1986, . . . Garcia . . . did wilfully and unlawfully take . . . the property of Kiril Georgiev *and* Capital Bond and Insurance Company. (Italics added.) The third grand-theft count alleges, " . . . on . . . January 26, 1986, . . . Garcia . . . did wilfully and unlawfully take . . . the property of Barbara Ruiz *and* Capital Bond and Insurance Company. (Italics added.) Finally, as to the fourth count of grand theft, the information reads, " . . . on . . . November 15, 1985, . . . Garcia . . . did wilfully and unlawfully take . . . the property of J.R. Pylman *and* Capital Bond and Insurance Company. (Italics added.) Thus, four separate thefts, each occurring on different dates and involving different multiple victims were alleged.

Garcia then turns to remarks made by the prosecutor during his argument to the jury to show that the thefts were but one and were done pursuant to a single plan. Specifically, he points to the prosecutor's statement that, "The People contend that . . . Garcia conspired with T[om] . . . to commit *the* offense of grand theft. That their *scheme and plan* was the creation of false bonds for the purpose of obtaining premiums for individuals and pocketing the benefits themselves. [¶] That was why this *scheme and plan* was developed by Tom . . . and . . . Garcia . . . ." (Italics added.) However, the prosecutor also argued that each of the grand thefts was a separate occurrence. As to the victims of each, he stated, "[There] are . . . two types as to each count." He proceeded to name the "civilian

victims," adding, "But we also have an additional victim attached to each count, Capital . . . . [¶] . . . [W]e get to grand theft by a different theory depending on what victim we are relating to." Thus, contrary to Garcia's contention, the victims in each count were not, either by pleading or by argument of the prosecutor, in the alternative. Certainly, the evidence presented shows that each of the "civilian" victims gave Garcia or Tom funds for a bond which turned out to be worthless, funds which were never returned. In addition, as to each count, Capital was cheated out of its percentage of the premium, Garcia and Tom having taken the entire premium for themselves. Thus, under no circumstances can it be argued that there was a single victim of each of the thefts.

In arguing that multiple thefts which spring from a unitary plan or scheme constitute one theft, Garcia cites a number of cases. However, only two of those decisions relate to the factual context at hand, i.e., where multiple victims are involved.[9] Those two cases are *People* v. *Brooks* (1985) 166 Cal.App.3d 24 [210 Cal.Rptr. 90] and *People* v. *Columbia Research Corp.* (1980) 103 Cal.App.3d Supp. 33 [163 Cal.Rptr. 455].

In *Brooks*, the court held that an auction service, which, on one particular date, sold goods consigned to it by fourteen different individuals and then did not hand over to the individuals the profits from the sales, was guilty of only one count of grand theft. The *Brooks* court cited the Supreme Court decision of *People* v. *Bailey* (1961) 55 Cal.2d 514 [11 Cal.Rptr. 543, 360 P.2d 39], holding that " . . . where as part of a single plan a defendant . . . receives various sums from *the* victim the receipts may be cumulated to constitute but one offense of grand theft." (*Id.*, at p. 518, italics added.) *Brooks* went on to extend *Bailey* to the circumstances before it in which several people were victimized, citing the following as justification, "Where offenses arising out of the same transaction are not crimes of violence, but crimes against the property interests of several persons, only single *punishment* is possible. (*People* v. *Bauer* (1969) 1 Cal.3d 368, 378 . . . .) 'If the rule were otherwise a burglar who entered an empty house and took numerous articles belonging to one person could be *punished* for only one offense, but if some of the articles belonged to each of the other members of the family, the burglar could be given *consecutive sentences* for as many offenses as there are members of the family. The situation would be even more anomalous where stolen property was owned jointly or by a partnership.'

---

[9] Although Garcia contends *People* v. *Richardson* (1978) 83 Cal.App.3d 853 [148 Cal.Rptr. 120], disapproved on other grounds in *People* v. *Saddler* (1979) 24 Cal.3d 671, 682, fn. 8 [156 Cal.Rptr. 871, 597 P.2d 130], involves multiple victims, it does not as to the *theft charges* involved. The only victim of the grand theft counts was the City of Los Angeles. (*Id.*, at p. 866.) Both the city and Crocker Bank were listed as victims of a *forgery* count (*id.*, at p. 858, fn. 2), but this has nothing to do with the thefts.

([*People* v. *Bauer, supra,* 1 Cal.3d] at p. 378.)" (*People* v. *Brooks, supra,* 166 Cal.App.3d at p. 31, italics added.)

However, *Bauer,* upon which *Brooks* rests its justification for prohibiting multiple theft convictions where one plan or scheme victimizes many, is strictly a *Penal Code section 654* case, and holds only that multiple *punishments* may not be had under such circumstances. In no fashion does *Bauer* support *Brooks*'s prohibition of multiple *convictions. Bauer,* in fact, is often cited as precedent for the rule that Penal Code section 654 proscribes only double punishment, not multiple convictions for a single course of conduct. (*In re Ronnie N.* (1985) 174 Cal.App.3d 731 [220 Cal.Rptr. 365].) Garcia himself, in his reply brief, concedes that section 654 does not support his position. Unfortunately for him, section 654 is the bedrock of *Bauer,* which is the bedrock of *Brooks,* which is the bedrock of his argument.

*Columbia,* the only other case involving multiple victims, suffers from the same defect. Like *Brooks, Columbia* justified application of the *Bailey* doctrine to multiple victims as follows:

"When a crime arising out of the same transaction is one against the property interests of several persons, rather than one of violence, only a single *punishment* is permissible as opposed to successive punishments for each theft. (*People* v. *Bauer* . . . .) [¶] The question posed by this appeal, whether a prosecutor may cumulate petty thefts from *numerous* victims to charge one grand theft, appears to be one of first impression in California. By combining the principles of *Bailey* and *Bauer,* we have decided that a series of thefts of amounts less than $200 from more than one victim can be cumulated to charge grand theft if the allegations support the theory that the series of thefts were accomplished as a result of one scheme or plan to defraud the victims and a single intent to act." (*People* v. *Columbia Research Corp., supra,* 103 Cal.App.3d Supp. at p. 40, italics original and added.)

Thus, we find neither *Brooks* nor *Columbia* persuasive authority for holding, as a matter of law or otherwise, that Garcia committed only one grand theft.[10]

---

[10] In *People* v. *Church* (1989) 215 Cal.App.3d 1151 [264 Cal.Rptr. 49], Division One of this court refused to apply *Brooks* or *Bailey* to reduce to one conviction four burglaries committed one after the other at the same complex, pursuant to the same scheme or plan, holding that they "represented separate intrusions into the privacy of *separate victims* and were validly chargeable as distinct offenses." (*Id.,* at p. 1159, italics added.)

## DISPOSITION

The judgment is affirmed.

Timlin, J., and McDaniel, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied December 13, 1990.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.