Robert **TURNER**, Petitioner–Appellant,

v.

Charles D. **MARSHALL**, Warden,
Respondent–Appellee.

No. 93–55477.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 6, 1995.

Decided Aug. 2, 1995.

Richard D. Cleary, Los Angeles, CA, for petitioner-appellant.

Robert Turner, Corcoran, CA, in pro. per.

David F. Glassman, Deputy Atty. Gen., Los Angeles, CA, for respondent-appellee.

Before: PREGERSON, POOLE and D.W. NELSON, Circuit Judges.

D.W. NELSON, Circuit Judge:

Petitioner–Appellant Robert Turner appeals the district court's denial of his petition for a writ of habeas corpus arising from his state court conviction for felony murder, robbery, burglary, and use of a dangerous weapon in committing a felony. Turner alleges that he was convicted in violation of his federal constitutional rights because (1) the prosecutor impermissibly used peremptory challenges to remove African–Americans from the petit jury on account of their race, in violation of the Equal Protection Clause of the Fourteenth Amendment; (2) a readback of testimony outside the presence of Turner and his counsel violated his Sixth Amendment rights; (3) there was insufficient evidence to support a felony murder conviction; (4) the prosecutor improperly commented on the attorney-client privilege; (5) prosecutorial misconduct infringed on Turner's right to due process of law; (6) the court improperly failed to instruct on the lesser included offense of theft; (7) the court discouraged the jury from requesting a readback of testimony; and (8) the court erred in using the California Jury Instruction on consciousness of guilt.

We have jurisdiction under 28 U.S.C. § 1291. We remand to the district court for an evidentiary hearing on Turner's claims of race-based peremptory challenges and violation of his Sixth Amendment right to be present at the readback of testimony. We

affirm the district court's denial of the petition on the remaining claims.

## BACKGROUND

On the evening of May 24, 1988, Roy Hunt was murdered in the living room of his home. The perpetrator had used a marble figurine to strike Hunt in the head multiple times. When the police found Hunt's body the next day, his watch, ring, wallet, television, VCR, and a candlestick were missing. The police found a blood spot among video cassette cases some distance from the body, as well as several cigarette butts, but no fingerprints.

In the early hours of June 4, 1988, Hunt's house was burglarized again. That morning, a police officer saw Turner driving Hunt's car and promptly arrested him. In the car, the police found several of Hunt's belongings and a plastic container which held two of Hunt's teeth. In Turner's pocket, they found Hunt's ring. In later statements, Turner admitted that he had assisted in the June 4 burglary, but denied any involvement in the May 24 murder and robbery of Hunt.

At trial, expert testimony relating to tests on the blood found in Hunt's house revealed that it was consistent with Turner's blood, and that only 0.13 percent of the population have blood consistent with the sample. The criminalist also testified that saliva found on the cigarette butts in Hunt's home was consistent with Turner's saliva. In addition, friends of Hunt testified that he always wore the ring, and that he had been wearing it on the evening of the murder.

Turner testified that he had gone to Hunt's house on June 4 at the direction of Donna Stephens, his brother's girlfriend. He helped load items from the house into a car (Hunt's), and secretly took some small items, including the gold ring, for himself. He claimed that he was on his way to sell the items when he was apprehended by the police. However, Stephens testified that she had no involvement in either incident. In addition, several witnesses testified that prior to trial, Turner had given statements inconsistent with his testimony.

The jury convicted Turner of first degree (felony) murder, Cal.Penal Code § 189; robbery, id. § 211; burglary, id. § 459; and use of a dangerous weapon in committing a felony, id. § 12022(d). He was sentenced to life imprisonment without the possibility of parole. The California Court of Appeal denied his appeal, in which he presented the same issues presented to this court. After the California Supreme Court denied review, Turner filed a petition for a writ of habeas corpus in federal district court, which was denied.

## STANDARD OF REVIEW

This court reviews a denial of a petition for a writ of habeas corpus de novo. *Sanders v. Ratelle,* 21 F.3d 1446, 1451 (9th Cir.1994).

## DISCUSSION

### I. The *Batson* Claim

Turner, who is African–American, argues that under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the trial court erroneously determined that he had failed to make a prima facie case that the prosecution had engaged in discriminatory use of peremptory challenges, in violation of the Equal Protection Clause of the Fourteenth Amendment.[1] During voir dire, the government used five out of nine peremptory challenges to exclude African–Americans (three men and two women) from the jury. For his part, Turner's counsel employed 19 peremptory challenges, excluding two African–American men. At the time of Turner's *Batson* motion, four African–American women remained on the jury. The trial judge, noting that the prosecutor had also excluded white venirepersons, stated that he saw no "pattern of individualized discrimination." Acknowledging the presence of nine mem-

---

1. Turner frames his challenge in terms of *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), the case finding that discriminatory use of peremptory challenges violates the California Constitution. Because only federal constitutional claims are cognizable in federal habeas corpus proceedings, *Gutierrez v. Griggs,* 695 F.2d 1195, 1197 (9th Cir.1983), we construe Turner's claims as alleging violations of federal constitutional rights and will only discuss them in such a light.

bers of racial minority groups on the jury at that time, the judge declined to inquire into the prosecutor's motives for her peremptory challenges.

■■■ Under *Batson*, a prosecutor's racially discriminatory use of peremptory challenges constitutes a violation of equal protection. 476 U.S. at 97, 106 S.Ct. at 1723. Initially, a defendant must establish a prima facie case that (1) the defendant is a member of a cognizable racial group; (2) the prosecution has removed members of such a racial group; and (3) circumstances raise an inference that the challenges were motivated by race. *Id.* at 96, 106 S.Ct. at 1723; *United States v. Bishop*, 959 F.2d 820, 824 n. 6 (9th Cir.1992); *United States v. Chinchilla*, 874 F.2d 695, 697 (9th Cir.1989). At that point, the burden shifts to the government to articulate a race-neutral basis for the peremptory challenges. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723; *Chinchilla*, 874 F.2d at 697.

### A. Cognizable Group

Because African–American women remained on the jury, Turner focuses on the exclusion of black men from the jury as the basis for a *Batson* violation. However, neither the Supreme Court nor the Ninth Circuit has recognized that the combination of race and gender, such as "black males," may establish a cognizable group for *Batson* purposes. *See United States v. Changco*, 1 F.3d 837, 839 (9th Cir.) (declining to address whether "minority women" are an identifiable class), *cert. denied*, —— U.S. ——, 114 S.Ct. 619, 126 L.Ed.2d 583 (1993). In fact, the two circuits that have addressed this issue have held that a defendant may not seek *Batson* relief on the basis of exclusion of "black men" or "black women." *See United States v. Nichols*, 937 F.2d 1257, 1262 (7th Cir.1991), *cert. denied*, 502 U.S. 1080, 112 S.Ct. 989, 117 L.Ed.2d 151 (1992); *United States v. Dennis*, 804 F.2d 1208, 1210 (11th Cir.1986), *cert. denied*, 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987).

■■■ Although the issue of whether African–American men could constitute a *Batson* class likely is worthy of consideration in light of recent holdings that gender as well as race is an impermissible basis for peremptory

challenges, *see, J.E.B. v. Alabama ex rel. T.B.*, —— U.S. ——, ——, 114 S.Ct. 1419, 1426, 128 L.Ed.2d 89 (1994); *United States v. DeGross*, 960 F.2d 1433, 1439 (9th Cir.1992), we decline to consider this issue because any new rule defining what constitutes a "cognizable group" could not be applied to Turner's case. *See Teague v. Lane*, 489 U.S. 288, 299–300, 316, 109 S.Ct. 1060, 1069–1070, 1078, 103 L.Ed.2d 334 (1989); *Echlin v. LeCureux*, 995 F.2d 1344, 1351 (6th Cir.1993) (finding that *Teague* precludes application of a new rule extending *Batson* to allow white defendants to challenge the exclusion of white jurors), *cert. denied*, —— U.S. ——, 114 S.Ct. 552, 126 L.Ed.2d 453 (1993). Accordingly, we limit our inquiry to whether Turner has made a prima facie case of impermissible exclusion of African–American jurors as a class, with no reference to gender. *See Changco*, 1 F.3d at 839.

### B. Inference of Discrimination

■■■ Focusing on exclusion of African–Americans as a group, we find that Turner has satisfied the first two requirements of the prima facie case. The key issue, therefore, is whether Turner has shown that the facts and circumstances "raise an inference" of exclusion on the basis of race so as to require inquiry into the prosecutor's motives. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723. In assessing this issue, we note that "[t]here is no magic number of challenged jurors which shifts the burden to the government to provide a neutral explanation for its actions." *Chinchilla*, 874 F.2d at 698. "[T]he combination of circumstances taken as a whole must be considered." *Id.* We find that Turner has identified circumstances which raise an inference of discrimination.

First, Turner offered the statistical fact that the prosecutor had used peremptory challenges to exclude five African–Americans out of a possible nine African–American venirepersons. A pattern of exclusion of minority venirepersons provides support for an inference of discrimination. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723; *United States v. Battle*, 836 F.2d 1084, 1085 (8th Cir.1987). We have considered *Batson* arguments in several other cases in which the prosecution

struck some, but not all, of the minority venirepersons. *See Bishop,* 959 F.2d at 822 (two of four black jurors stricken); *United States v. Lorenzo,* 995 F.2d 1448, 1453 (9th Cir.) (three of nine Hawaiian jurors stricken), *cert. denied,* ⸺ U.S. ⸺, 114 S.Ct. 227, 126 L.Ed.2d 182 (1993); *United States v. Power,* 881 F.2d 733, 740 (9th Cir.1989) (one of two black jurors stricken).[2] Other circuits have found an inference of discrimination under similar circumstances. *See, e.g., United States v. Alvarado,* 923 F.2d 253, 255 (2d Cir.1991) (finding a prima facie case when the prosecution struck four out of seven minority jurors); *Battle,* 836 F.2d at 1086 (finding a prima facie case when five of seven blacks were challenged).

The fact that the prosecutor did not attempt to remove all the African–American jurors weighs against Turner's claim, but it is not dispositive. *See Montiel v. City of Los Angeles,* 2 F.3d 335, 340 (9th Cir.1993); *Chinchilla,* 874 F.2d at 698 n. 4. In fact, we have held that a trial judge "clearly erred" by refusing to inquire into the prosecutor's motives for peremptory challenges, in a case in which the prosecutor had excluded three Hispanics and two African–Americans, even though the government declined to strike a remaining minority venireperson. *Montiel,* 2 F.3d at 340.[3] The courts in *Alvarado* and *Battle* similarly found an inference of discrimination even though the prosecution declined to challenge certain African–American venirepersons. *Alvarado,* 923 F.2d at 255; *Battle,* 836 F.2d at 1086. Thus, although the percentage of African–Americans challenged in the present case was lower than in *Montiel,* we conclude that the prosecutor's exclusion of five out of nine available African–American venirepersons removed a sufficient percentage of African–Americans to establish a pattern of discrimination.

Not only did the prosecution strike a significant proportion of the available African–American venirepersons, but it also used a significant percentage of its peremptory challenges against African–Americans. Out of the nine peremptory challenges made by the prosecution, five were made against African–Americans. In *Montiel,* we found an inference of discrimination when the prosecution used five of its seven peremptories against African–Americans. 2 F.3d at 340.

As part of its consideration of whether an inference of discrimination has been raised, several courts have analyzed whether the percentage of prosecutorial challenges made against minorities was disproportionately higher than the percentage of the minority group within the venire. *See Alvarado,* 923 F.2d at 255–56 (finding a prima facie case because the prosecution challenged 50 percent of minority venirepersons, who represented only 30 percent of the pool); *United States v. Johnson,* 873 F.2d 1137, 1140 (8th Cir.1989) (considering the disproportionate rate of strikes against blacks to be relevant evidence of discrimination). Although the record lacks statistics on the racial makeup of the venire as a whole, approximately 30 percent (11 out of 37) of the venirepersons who appeared before the court for voir dire were African–American. Yet the government used a significantly higher percentage of its peremptory challenges—56 percent— against African–Americans. Such a disparity also supports an inference of discrimination. *See Alvarado,* 923 F.2d at 256. Thus, two different statistics—the percentage of available African–Americans challenged, and the percentage of peremptory challenges used against African–Americans—provide support for an inference of discrimination.

---

**2.** In these cases, because the trial court had inquired into the prosecutor's motivations for removing the jurors, we assumed the existence of a prima facie case and moved on to the analysis of the proffered reasons for removal.

**3.** By contrast, we held in *United States v. Vaccaro,* 816 F.2d 443 (9th Cir.1987), *cert. denied,* 484 U.S. 928, 108 S.Ct. 295, 98 L.Ed.2d 255 (1987), that striking the only two African–Americans on the venire did not constitute a "pattern" of exclusion sufficient to establish a prima facie case.

However, the *Vaccaro* court noted that the defendants had relied on the claim that there was a "pattern" of race-based strikes and therefore did not consider other means by which to establish an inference of discrimination. *See id.* at 457; *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. Moreover, its finding of a lack of a pattern was premised on the view that "just two" challenges does not establish such a pattern. In the present case, five African–Americans were excluded.

■ Finally, the state trial judge may have impermissibly relied on the fact that African–Americans and other minorities remained on the jury, without considering other factors. In response to Turner's *Batson* motion, the judge simply reviewed the racial and ethnic makeup of the excluded venirepersons and of the petit jury at the time of the motion, and concluded, "I don't see any pattern of individual discrimination at this point ... I think we've got a fair mix right now." [4] He gave no indication that he considered the prosecutor's questions and statements during voir dire, the venirepersons' responses, or any other factors. *See Battle*, 836 F.2d at 1085 (noting that these factors should be considered). In denying a *Batson* motion, however, a trial court may not rely solely on the fact that some African–Americans remain on the jury. *See Palmer v. Estelle*, 985 F.2d 456, 458 (9th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 3051, 125 L.Ed.2d 735 (1993). Regardless of the final racial makeup of the jury, the exclusion of a single minority juror on account of race would constitute a *Batson* violation. *See Bishop*, 959 F.2d at 827; *Johnson*, 873 F.2d at 1137. With only the trial court's incomplete analysis upon which to rely, we cannot foreclose the possibility of discrimination.

We have stated that, in the prima facie analysis, "it is preferable for the court to err on the side of the defendant's right to a fair and impartial jury." *Chinchilla*, 874 F.2d at 698 n. 5. Taken as a whole, the facts and circumstances reveal that Turner established a prima facie case of a *Batson* violation, such that the state trial court erred in failing to inquire into the prosecutor's reasons for the peremptory challenges. *See Montiel*, 2 F.3d at 340. Because of this omission, we remand for the district court to conduct an evidentiary hearing at which it must elicit the prosecutor's motives at the time of the voir dire in order to determine whether there was a *Batson* violation. *See Battle*, 836 F.2d at 1086.

## II. Readback of Testimony Outside the Presence of the Defendant and Counsel

Turner alleges that the trial court allowed the court reporter to read back testimony to the jury outside the presence of Turner and his counsel, in violation of Turner's rights under the Confrontation Clause of the Sixth Amendment. The government argues that the record is too ambiguous to support Turner's claim. We disagree.

■ Although the government correctly notes the discrepancies between the reporter's transcript and the clerk's transcript, the record indicates that on March 20, 1990, the reporter read back testimony to the jury "in the jury room outside the presence of counsel and the defendant." The government attempts to refute this evidence with the clerk's transcript, which indicates that Turner's counsel was "notified" of a readback on March 19, that the readback continued on March 20, and that the defendant and counsel were present in court on March 20. Because presence in court does not prove presence in the jury room, this notation does not rebut the record evidence that a readback occurred outside Turner's presence. We have held that failure to allow the defendant to be present at the readback of testimony is constitutional trial error. *See Hegler v. Borg*, 50 F.3d 1472, 1477 (9th Cir.1995); *United States v. Brown*, 832 F.2d 128, 130 (9th Cir.1987).

■ The government argues that even if Turner and his counsel were not present during the readback on March 20, they had waived their right to be present. We disagree. Although on March 16, Turner and his counsel both agreed to allow the jury to listen to a tape recording of testimony outside their presence, that waiver did not apply to the March 20 live readback of testimony. First, the parties had agreed in advance to a general policy that counsel should be present for readbacks. Any waiver, therefore, should

---

**4.** Although we normally give great deference to a trial court's factual findings regarding purposeful discrimination in jury selection, this deference applies to the court's assessment of the prosecutor's state of mind and credibility. *See United States v. Bishop*, 959 F.2d 820, 826–27 (9th Cir.

1992). Because the trial judge made no inquiry into the prosecutor's reasons for excluding the African–American venirepersons, we need not defer to the judge's conclusory determination that there was no discrimination. *See id.*

be construed as a limited exception to this rule. Second, Turner's lawyer had carefully reviewed the tape and transcript to be presented to the jury on March 16. Since the waiver undoubtedly was based in part on the attorney's assessment that the playback of that tape would not unfairly prejudice his client, we should not construe the March 16 waiver to constitute a waiver of the right to be present at future readbacks, absent the opportunity to review the specific testimony to be read back in those instances. Third, a waiver of presence during the playing of a tape recording should not be construed to apply to a live readback of testimony, because the potential for prejudice is greater during a live readback.

■ Moreover, the notation that counsel was notified, on March 19, of the March 20 readback does not constitute a waiver of Turner's right to be present. Even if the notification of counsel could be construed as a waiver of the right to have counsel present at the readback, the defendant must personally waive his right to be present. *See United States v. Kupau*, 781 F.2d 740, 743 (9th Cir.), *cert. denied*, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986). Because there is no indication that Turner waived this right in relation to the March 20 readback, we find that the readback outside his presence amounted to constitutional trial error. *See Hegler*, 50 F.3d at 1477.

■ Under *Hegler*, such error is subject to harmless error analysis. In the habeas context, an error is not harmless only if it "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). Although several analogous cases have found harmless error, they have done so after an evidentiary hearing at which the relevant parties, such as the court reporter or the jurors, were questioned. *See id.* at 1478; *Lee v. Marshall*, 42 F.3d 1296, 1298 (9th Cir.1994) (finding after an evidentiary hearing that allowing the presence of a government agent in the jury room during a playback of testimony constituted harmless error); *Bustamante v. Eyman*, 456 F.2d 269, 274 (9th Cir.1972) (requiring an evidentiary

hearing to determine if a replay of jury instructions outside defendant's presence constituted harmless error). We would only dispense with an evidentiary hearing if the record clearly indicated that there was no prejudice. *Kupau*, 781 F.2d at 742 (finding harmless error when the record revealed that the judge explicitly warned the jury to ignore the presence of an FBI agent in the jury room during playback of testimony).

■ However, in the present case, the record provides no indication of any attempts to dispel possible prejudice, or of any analysis into the circumstances surrounding the readback. "An evidentiary hearing on a habeas corpus petition is required whenever a petitioner's allegations, if proved, would entitle him to relief, and no state court trier of fact has, after a full and fair hearing, reliably found the relevant facts." *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir.1990), *cert. denied*, 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1059 (1991). Moreover, the danger of prejudice was particularly high because the readback in question dealt with the testimony on the critical blood tests. Because this case, in which all the evidence was circumstantial, turned on the credibility of the defendant and the reliability of laboratory tests on very minute samples of blood and saliva, we cannot conclude based on this record that the error was harmless. *See Christian v. Rhode*, 41 F.3d 461, 468–69 (9th Cir.1994) (considering the totality of the evidence in assessing harmless error). Accordingly, we remand to the district court for an evidentiary hearing in order to determine whether the readback outside the presence of Turner and his counsel was harmless error. *See Hegler*, 50 F.3d at 1478; *Brown*, 832 F.2d at 130; *Bustamante*, 456 F.2d at 275.

## III. Sufficiency of the Evidence

■ Turner argues that there was insufficient evidence to convict him of felony murder, Cal.Penal Code § 189, or to find the "robbery-murder special circumstance" needed to impose a sentence of life imprisonment without parole, Cal.Penal Code

§ 190.2(a)(17)(i), (vii).[5] A conviction based on insufficient evidence violates due process. *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979). Considering the evidence in the light most favorable to the prosecution, we review the record to determine if any rational trier of fact could find the elements beyond a reasonable doubt. *Id.; Hendricks v. Vasquez,* 974 F.2d 1099, 1106 (9th Cir.1992). We reject Turner's claim.

■ To prove felony murder, the prosecution initially had to prove that Turner committed either robbery or burglary on May 24. Robbery is the "felonious taking of personal property in the possession of another, from his person or immediate presence … by means of force or fear." Cal.Penal Code § 211. The blood and saliva evidence placed Turner at the scene, the ring and other personal items found in Turner's possession provided evidence of the taking of Hunt's property, and the killing of Hunt provided evidence of force. Although intent to steal is a required element, the jury could infer intent from the evidence that Turner had taken the property of another. *People v. Turner,* 50 Cal.3d 668, 268 Cal.Rptr. 706, 714, 789 P.2d 887, 895 (1990), *cert. denied,* 498 U.S. 1053, 111 S.Ct. 768, 112 L.Ed.2d 787 (1991); *People v. Butler,* 65 Cal.2d 569, 55 Cal.Rptr. 511, 514, 421 P.2d 703, 706 (1967).

■ Burglary is the entering of a house, apartment, or other listed structure with the intent to commit larceny or any felony. Cal.Penal Code § 459. The evidence that Turner had been present satisfied the entry element; although there was no evidence of forcible or unauthorized entry, this is not a requirement for burglary. *People v. Talbot,* 64 Cal.2d 691, 51 Cal.Rptr. 417, 423, 414 P.2d 633, 639 (1966), *overruled on other grounds,* 1 Cal.3d 431, 82 Cal.Rptr. 494, 501, 462 P.2d 22, 29 (1970).

■ Since the evidence was sufficient to prove that Turner had committed robbery or burglary, his presence, the blood evidence, and the simultaneous murder of Hunt were sufficient to prove first degree felony murder. *See People v. Turville,* 51 Cal.2d 620, 335 P.2d 678, 685, *cert. denied,* 360 U.S. 939, 79 S.Ct. 1465, 3 L.Ed.2d 1551 (1959). Turner correctly notes that there would be no felony murder absent evidence that he formed the intent to steal *before* the murder: if he killed Hunt, and then decided to steal property, there would be no felony murder because there only would be theft, not robbery. *See Turner,* 268 Cal.Rptr. at 714, 789 P.2d at 895. However, in a very similar case, the California Supreme Court rejected this argument and found that evidence that the defendant was present, the victim was murdered, and property was taken allowed the jury to infer that the killing was done for purposes of robbery. *Id.* 268 Cal.Rptr. at 714, 789 P.2d at 895.

■ *Turner* also found that this evidence sufficed to find the robbery-murder special circumstance. *Id.* The contrary cases cited by Turner are distinguishable because the evidence in those cases included affirmative indications that the robbery was "merely incidental" to the murder, which would preclude the robbery-murder special circumstance. *See Turner,* 268 Cal.Rptr. at 714, 789 P.2d at 895. In *People v. Green,* 27 Cal.3d 1, 164 Cal.Rptr. 1, 609 P.2d 468 (1980), *overruled on other grounds,* 41 Cal.3d 826, 226 Cal.Rptr. 112, 718 P.2d 99 (1986), the court found insufficient evidence of a robbery-murder special circumstance where the defendant had expressed his intention to kill his ex-wife, killed her in a deserted area, and only removed her personal effects (the robbery) to make the body difficult to identify. *See id.* 164 Cal.Rptr. at 37–39, 609 P.2d at 504–06. In *People v. Thompson,* 27 Cal.3d

---

5. First degree felony murder requires proof that a killing was committed "in the perpetration of" robbery, burglary, or other listed crimes. Cal.Penal Code § 189. The special circumstance finding, that the murder was committed while the defendant was engaged in robbery or burglary, differs slightly in that the government must show that the murder was committed "during the commission" of the robbery, such that the

robbery was not "merely incidental" to the murder. *People v. Green,* 27 Cal.3d 1, 164 Cal.Rptr. 1, 37, 609 P.2d 468, 504 (1980), *overruled on other grounds,* 41 Cal.3d 826, 226 Cal.Rptr. 112, 117 n. 3, 718 P.2d 99, 104 n. 3 (1986); *People v. Zapien,* 4 Cal.4th 929, 17 Cal.Rptr.2d 122, 153, 846 P.2d 704, 735 *cert. denied,* — U.S. ——, 114 S.Ct. 315, 126 L.Ed.2d 262 (1993).

303, 165 Cal.Rptr. 289, 611 P.2d 883 (1980), the court found insufficient evidence for a robbery special circumstance because the evidence indicated that although the defendant had demanded money, this was just a cover for a revenge killing. *See id.* 165 Cal.Rptr. at 299–300, 611 P.2d at 893–94. He actually had declined the victim's offer of money and a ring, and he did not steal any items. *See id.* Because the present case lacked such affirmative indications that the robbery was incidental to the killing, we rely on *Turner* and reject the claim that there was insufficient evidence.

## IV. Comment on the Attorney–Client Privilege

Turner argues that the prosecutor improperly commented on the attorney-client privilege during her examination of the serology expert, Belmont Beasley. After the prosecutor had asked Beasley whether a laboratory hired by the defense had placed a red seal on the blood sample, the trial court sustained an objection, struck the question and response, and instructed the jury to disregard the statement. Based on the premise that the prosecutor's comment might have led the jury to believe that the defense had analyzed the sample, Turner claims that the jury may have drawn an adverse inference from the defense's failure to present evidence disputing the validity of the prosecution's findings. We review a claim of a Sixth Amendment violation de novo. *United States v. Hernandez,* 937 F.2d 1490, 1493 (9th Cir.1991).

We reject Turner's claim. First, Turner provides no basis for a federal constitutional violation justifying a writ of habeas corpus. His reliance on *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965) (holding that a prosecutor's comment on the defendant's failure to testify violates the Fifth Amendment), is misplaced because the prosecutor's question was analogous to a comment on the failure of the defense to present evidence—that the laboratory results were flawed—which would not violate federal constitutional rights. *See United States v. Lopez–Alvarez,* 970 F.2d 583, 596 (9th Cir.), *cert. denied,* —— U.S.

——, 113 S.Ct. 504, 121 L.Ed.2d 440 (1992); *United States v. Castillo,* 866 F.2d 1071, 1083 (9th Cir.1988).

Similarly, Turner's attempt to frame this incident as a violation of his Sixth Amendment right to counsel is misguided. The case he cites, *United States v. Irwin,* 612 F.2d 1182 (9th Cir.1980), states that the government might impermissibly infringe on the attorney-client relationship by making disparaging comments about defense counsel or attempting to dissuade a defendant from conferring with his counsel. *See id.* at 1186–88. In the present case, the government has not intruded on Turner's relationship with his attorney to his detriment.

Likewise, Turner's reliance on *United States ex rel. Macon v. Yeager,* 476 F.2d 613 (3d Cir.), *cert. denied,* 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973), is inappropriate because that case held that a prosecutor may not imply guilt by revealing that a defendant contacted a lawyer after arrest. *Id.* at 615; *see also Bruno v. Rushen,* 721 F.2d 1193, 1194 (9th Cir.1983), *cert. denied,* 469 U.S. 920, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984). The prosecutor's reference to a defense laboratory, at worst, was an isolated, indirect reference to the defendant's use of an attorney. *Cf. United States v. Bagley,* 772 F.2d 482, 495 (9th Cir.1985) (stating that the court will not assume that the jury will construe an isolated remark as a comment on the failure to testify), *cert. denied,* 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986). Significantly, the trial court took swift action by sustaining an objection, striking the statement, and instructing the jury. Such curative actions are usually presumed to neutralize damage such that any error was harmless. *See Greer v. Miller,* 483 U.S. 756, 766 & n. 8, 107 S.Ct. 3102, 3109 & n. 8, 97 L.Ed.2d 618 (1987); *United States v. Simtob,* 901 F.2d 799, 806 (9th Cir.1990). We therefore reject Turner's claim of impermissible intrusion into the attorney-client privilege.

## V. Prosecutorial Misconduct

Turner asserts that several instances of alleged prosecutorial misconduct, taken together, infringed on his due process rights. A constitutional violation would arise if the

incidents "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1979).

   ■ We find that none of the alleged incidents, together or separately, compel reversal. Turner's principal objection is to the prosecutor's closing argument in which she recalled the victim's teeth, which were found in the possession of Turner, and labelled them as "a gruesome, horrible, horrific memento." She also called the perpetrator, though not Turner specifically, a "monster of a human being." Although arguably inflammatory, these comments are strikingly similar to comments upheld by the Supreme Court in *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), in which the prosecutor specifically called the defendant an "animal," labelled the crime as "the work of an animal," and argued that the defendant should not be let out of his cell without a leash. *Id.* at 179–80 & n. 12, 106 S.Ct. at 2470–71 & n. 12. Accordingly, we find no due process violation arising from these comments.

   ■ Turner also criticizes the prosecutor's statement, in the presence of the jury, that if the court admitted into evidence a report offered by the defense, then it should admit part of a police report offered by the prosecution. In its most damaging light, this comment could be construed as a hint to the jury that unadmitted evidence existed that would tend to show Turner's guilt. Particularly because this comment made such a reference only in the most indirect manner, if at all, it would not establish a due process violation. *See United States v. Freter,* 31 F.3d 783, 786 (9th Cir.) (finding no violation of substantial rights arising from a reference during closing argument to documents not admitted into evidence), *cert. denied,* —— U.S. ——, 115 S.Ct. 646, 130 L.Ed.2d 551 (1994); *United States v. Molina,* 934 F.2d 1440, 1446 (9th Cir.1991) (reference to the possibility that nine more agents could have corroborated the government's case was not plain error).

   ■ Turner also alleges that the prosecutor accused Turner of lying during cross-examination. Even if the question was argumentative, however, a prosecutor may label a witness's testimony as lies or fabrication. *See Molina,* 934 F.2d at 1445; *United States v. Birges,* 723 F.2d 666, 671 & n. 1 (9th Cir.), *cert. denied,* 469 U.S. 863, 105 S.Ct. 200, 83 L.Ed.2d 131 (1984).

   ■ Finally, Turner claims that the prosecutor used leading questions and hearsay during its elicitation of the chain of custody from the serology expert, Belmont Beasley. In the discretion of the judge, some leading questions can be proper and would only justify reversal if their use amounted to a denial of a fair trial. *See Esco Corp. v. United States,* 340 F.2d 1000, 1005 (9th Cir. 1965); *see also United States v. Castro-Romero,* 964 F.2d 942, 943 (9th Cir.1992). In this instance, there was no denial of a fair trial because the judge actually sustained objections to leading questions. The only arguable use of hearsay occurred during the testimony on the chain of custody of the blood samples. Whereas use of hearsay would justify reversal only if there was actual prejudice, *see Hardnett v. Marshall,* 25 F.3d 875, 880–81 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995), Turner has given no indication that the alleged hearsay prejudiced his case. Accordingly, we find no due process violation arising from these or any of the other allegations of prosecutorial misconduct.

## VI. Lesser Included Offense Instruction

   ■ Turner alleges a due process violation arising from the failure of the judge to instruct the jury *sua sponte* on the offense of theft, which is a lesser included offense of robbery. This argument fails because it would require application of a new rule of law in a habeas corpus case. *See Teague,* 489 U.S. at 299–300, 109 S.Ct. at 1069.

It is well-settled that failure to instruct on a lesser included offense in a *capital* case would be constitutional error if there were evidence to support the instruction. *Beck v. Alabama,* 447 U.S. 625, 638, 100 S.Ct. 2382, 2390, 65 L.Ed.2d 392 (1980); *Hopper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 2052–

53, 72 L.Ed.2d 367 (1982). However, because the prosecution declined to seek the death penalty, the present case is properly classified as a noncapital case. *See Pitts v. Lockhart,* 911 F.2d 109, 112 (8th Cir.1990) (holding that a case in which the death penalty was sought but not imposed is a noncapital case), *cert. denied,* 501 U.S. 1253, 111 S.Ct. 2896, 115 L.Ed.2d 1060 (1991); *Rembert v. Dugger,* 842 F.2d 301, 303 (11th Cir.) (holding that *Beck* applies when the defendant faces the possibility of the death penalty), *cert. denied,* 488 U.S. 969, 109 S.Ct. 500, 102 L.Ed.2d 536 (1988).

There is no settled rule of law on whether *Beck* applies to noncapital cases such as the present one. In fact, this circuit, without specifically addressing the issue of extending *Beck,* has declined to find constitutional error arising from the failure to instruct on a lesser included offense in a noncapital case. *See Bashor v. Risley,* 730 F.2d 1228, 1240 (9th Cir.), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984). Of the circuits which specifically have addressed whether the *Beck* rule applies to non-capital cases, some find no constitutional right in noncapital cases. *See, e.g., Perry v. Smith,* 810 F.2d 1078, 1080 (11th Cir.1987); *Trujillo v. Sullivan,* 815 F.2d 597, 602 (10th Cir.), *cert. denied,* 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987). Others would only apply *Beck* to noncapital cases to prevent a "fundamental miscarriage of justice." *See, e.g., Tata v. Carver* 917 F.2d 670, 672 (1st Cir.1990); *Nichols v. Gagnon,* 710 F.2d 1267, 1272 (7th Cir.1983), *cert. denied,* 466 U.S. 940, 104 S.Ct. 1918, 80 L.Ed.2d 465 (1984). Still others have extended the *Beck* rule generally to noncapital cases. *See, e.g., Vujosevic v. Rafferty,* 844 F.2d 1023, 1027 (3d Cir.1988); *Ferrazza v. Mintzes,* 735 F.2d 967, 968 (6th Cir.1984). With the intercircuit split on whether the lack of a lesser included offense instruction in a noncapital case presents constitutional error, any finding of constitutional error would create a new rule, inapplicable to the present case under *Teague.* Because Turner has not asserted a constitutional error upon which relief could be granted, we reject his claim.

## VII.  Intimidation of the Jury

▮▮▮▮▮ Turner also argues that the trial judge, by asking the jury not to abuse the right to have the court reporter read back testimony to the jury, engaged in intimidation of the jury. The decision to allow a readback of testimony is reviewed for abuse of discretion. *United States v. Birges,* 723 F.2d 666, 671 (9th Cir.), *cert. denied,* 469 U.S. 863, 105 S.Ct. 200, 83 L.Ed.2d 131 (1984).

In *Birges,* the court found no error in the trial judge's refusal to allow a readback of testimony, absent a showing of prejudice. *Id.* at 671. If an outright refusal to allow a readback does not amount to federal constitutional error, then the trial judge's statement, "I want you to use [the readback privilege] if you need it but please don't utilize the reporter frivolously," did not violate Turner's constitutional rights. Furthermore, there is no evidence of prejudice in the present case, since the jury asked for and was allowed a readback on several occasions. We therefore find no abuse of discretion.

## VIII.  Instruction on Consciousness of Guilt

▮▮▮ Turner argues that the trial court erred in giving a particular consciousness of guilt instruction, California Jury Instruction (CALJIC) No. 2.03. In a habeas corpus case, a jury instruction requires reversal only if it "so offended established notions of due process as to deprive [the defendant] of a constitutionally fair trial." *Cupp v. Naughten,* 414 U.S. 141, 144, 94 S.Ct. 396, 399, 38 L.Ed.2d 368 (1974).

The court's instruction was as follows:

"If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination."

CALJIC No. 2.03.

In California, this instruction is proper in cases in which there is testimony indicating

that before trial the defendant had made several statements, relating to the crime, which were inconsistent with each other. *See Green,* 609 P.2d at 492 & n. 27; *People v. Kane,* 150 Cal.App.3d 523, 198 Cal.Rptr. 73, 79 (1984). In the present case, Turner at one point had told the police that he took Hunt's ring from the house during the June 4 burglary, but later stated that Donna Stephens had given it to him four days before that burglary. He also gave different accounts of his activities during that burglary. Thus, the instruction had a proper factual basis under California law.

To the extent that Turner argues that the instruction violated his constitutional rights, we have upheld the use of a very similar consciousness of guilt instruction. *See United States v. Perkins,* 937 F.2d 1397, 1401–02 & n. 2 (9th Cir.1991). So long as the instruction does not state that inconsistent statements constitute evidence of guilt, but merely states that the jury may consider them as indicating a consciousness of guilt, the instruction would not violate constitutional rights. *See id.* Because CALJIC No. 2.03 fits this requirement, we find no constitutional error.

## CONCLUSION

We vacate the district court's denial of the petition as it relates to the *Batson* claim and the claim of a readback of testimony outside the presence of the defendant and his counsel, and we remand to the district court for an evidentiary hearing on these claims. We affirm the district court's rulings on the remaining claims.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**