96 F.3d 1452
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael Wayne McCOY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Frederick W. DILLE, Jr., Defendant-Appellant.
 Nos. 95-10285, 95-10286.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 11, 1996.
Decided Aug. 29, 1996.
 
 1
 Before: O'SCANNLAIN and LEAVY, Circuit Judges; HUFF,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Appellants Michael Wayne McCoy and Frederick W. Dille, Jr. appeal their convictions on various mail fraud, securities fraud, bank fraud, and RICO charges. They each allege that the prosecution engaged in purposeful discrimination during jury selection in violation of Batson v. Kentucky, 476 U.S. 79 (1986). They also challenge various evidentiary rulings made by the court. In addition, Dille unilaterally argues that (1) alleged prosecutorial misconduct during closing argument constituted plain error, (2) the district court erred in denying his motion for a new trial on grounds of juror misconduct, and (3) the district court erred in imposing a two-level increase in his base offense level based on abuse of a position of trust. We affirm on all except the sentencing issue.
 
 
 4
 * McCoy and Dille both argue that the district court erred in denying their motion to quash the jury panel.[1] In denying the motion, the district court ruled that the prosecution did not violate Batson during jury selection. The court's finding that purposeful racial discrimination did not occur during jury selection is a finding of fact which we review for clear error. United States v. Contreras-Contreras, 83 F.3d 1103, 1106 (9th Cir.1996); United States v. Bauer, 84 F.3d 1549, 1555 (9th Cir.1996). We are not persuaded that the court clearly erred.
 
 
 5
 In Batson, the Supreme Court held that the Equal Protection Clause forbids prosecutors from using peremptory challenges to exclude potential jurors solely on account of their race. The appellants have the burden of proving purposeful discrimination under Batson. Bauer, 84 F.3d at 1554. As we noted in Bauer, the Supreme Court has outlined "a three-step process for evaluating allegations that the prosecution used peremptory challenges in violation of the Equal Protection Clause." Id. at 1554.
 
 
 6
 Under our Batson jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful racial discrimination.
 
 
 7
 Id. (quoting Purkett v. Elem, 115 S.Ct. 1769, 1770-71 (1995)). In order to make out a prima facie case, the defendants must show that
 
 
 8
 (1) the defendant is a member of a cognizable racial group; (2) the prosecution has removed members of such a racial group; and (3) circumstances raised an inference that the challenges were motivated by race.
 
 
 9
 United States v. Wills, 88 F.3d 704, 715 (9th Cir.1996) (quoting Turner v. Marshall, 63 F.3d 807, 812 (9th Cir.1995)). If the defendants fail to make their prima facie showing, the government is "not required to articulate a race-neutral basis for its peremptory challenges...." Id. In addition, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Contreras-Contreras, 83 F.3d at 1104 (quoting Hernandez v. New York, 500 U.S. 352, 359 (1991) (plurality opinion)).
 
 
 10
 As an initial matter, we note that this court has never applied Batson in a case in which the government did not use peremptory challenges to exclude members of a certain racial group. In addition, other circuit courts which have addressed the question have suggested that Batson would not apply in such a context. See, e.g., Wills, 88 F.3d at 715 ("Under Batson, a prosecutor's racially discriminatory use of peremptory challenges constitutes a violation of equal protection.") (emphasis added); United States v. Blackmun, 66 F.3d 1572, 1575 n. 3 (11th Cir.1995) ("no authority suggests Batson extends to the area of challenges for cause"), cert. denied, 116 S.Ct. 1365 (1996); United States v. Bergodere, 40 F.3d 512, 515-16 (1st Cir.1994) ("the defendant must show that the challenge was peremptory rather than for cause, thus bringing into play the Supreme Court's admonition that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate") (quoting Batson, 476 U.S. at 96) (internal quotation marks omitted), cert. denied, 115 S.Ct. 1439 (1995). However, even assuming arguendo that Batson applies in such a situation, we conclude that the district court's factual finding that purposeful discrimination did not occur is not clearly erroneous.
 
 
 11
 With respect to Juror Clark, the district court stated that:
 
 
 12
 Then the questions were asked of Mr. Clark. And he was a contractor. It was the Court's intention to try, as I did, to retain Mr. Clark as a juror. I did say that I was going to wait for defense counsel to inquire. However, when Mr. Clark did say that he had a concern at four weeks, that caused me to then inquire if it went over four weeks, it was going to be a problem. He said that it would, and he, basically, said that he could not sit if the case was going to go over four weeks. And, of course, although while we hope it does not, I cannot guarantee any juror how long the trial is going to last.
 
 
 13
 I also believe that it would have not been evenhanded of me if I had, at that point, said, "well, you are going to have to sit, Mr. Clark," where, on less inquiry, I excused other jurors on their statements that they either had employment or businesses that would cause them to not be as attentive to the trial as they should or to seek the hardship discharge.
 
 
 14
 For these reasons, because I do not believe that the challenge was racially motivated, I am going to deny the motion under Batson.
 
 
 15
 Appellants have failed to demonstrate that this finding was clearly erroneous. Accordingly, we reject their Batson challenge with respect to juror Clark.[2]
 
 
 16
 With respect to Juror Hayes, the district court concluded that the prosecution had offered a race-neutral explanation for any attempt which it may have made to keep Hayes off the jury. The government explained that it did not want Hayes on the jury in part because Hayes' son was a minister, and because the wife of one of the appellants was a minister. The court thus ruled that "the Court cannot ascribe racial motive in the exercises of the challenge where, in fact, there has been a rational explanation for the withdrawal of the challenge to Ms. Herrera." Appellants have again failed to demonstrate that this finding is clearly erroneous. Moreover, appellants' implicit argument that the government should be forced to exercise its peremptory challenges so as to allow the defense an opportunity to seat minority jurors is also meritless. See United States v. Canoy, 38 F.3d 893, 901 (7th Cir.1994) (rejecting similar claim on grounds that "we certainly do not read Batson to impose a duty on the government to utilize all of its peremptory strikes in order to ensure that members of a racial minority are seated on the jury").
 
 
 17
 Finally, with respect to Juror Mingo, we note that the appellants admit that "[t]here was concededly no definitive resolution as to Mr. Mingo's race or ethnicity." Accordingly, the appellants cannot establish that Mingo was a member of any cognizable racial group removed by the prosecution, and they have thus failed to make out their prima facie case. See Wills, 88 F.3d at 715.
 
 
 18
 For the foregoing reasons, we reject appellants' Batson claims.
 
 II
 
 19
 McCoy also challenges the district court's decision to allow Gerald Lyles, Vice-President of Lyles Diversified, Inc., a company with which McCoy had previously been associated in a general partnership, to testify regarding his prior business dealings with McCoy. McCoy argues that the evidence was irrelevant under Fed.R.Evid. 401 and inadmissible character evidence under Fed.R.Evid. 404(b). He also argues that even if the evidence was admissible, it was unfairly prejudicial under Fed.R.Evid. 403.[3] We review the district court's evidentiary rulings during trial for an abuse of discretion. United States v. Manning, 56 F.3d 1188, 1196 (9th Cir.1995) (citation omitted). The court did not abuse its discretion.
 
 
 20
 In December 1990, the California Department of Corporations ("DOC") began an investigation into McCoy's business dealings. The DOC concluded that MMA was selling unregistered securities, and issued a cease and desist order in May 1991. William Bickford, DOC's attorney, then requested additional information from McCoy regarding MMA's operations. In response, McCoy submitted a number of documents, including a document containing the following paragraph:
 
 
 21
 Prior to the formation of MMA, Mr. McCoy participated in a joint venture with Lyles Diversified Services for the sole purpose of factoring accounts receivable. After six months of operation, Lyles Diversified decided the business was not in their scope and dissolved the joint venture. Mr. McCoy initiated a note with Lyles Diversified for the cost of funding the project. Due to Mr. McCoy's good faith, Lyles Diversified had continued to back MMA as a positive referral source which has led to specific profitable dealings with other financial entities.
 
 
 22
 According to the prosecution, this paragraph was inaccurate, and it represented an attempt on McCoy's part to deceive the DOC into believing that the Lyles/McCoy relationship was a good one. According to the prosecution, Lyles in fact believed that McCoy had stolen money from him, and had improperly sold him certain fraudulent accounts receivable. Accordingly, in the prosecution's view, the letter provided to the DOC by McCoy improperly suggested that (1) McCoy had volunteered to provide the promissory note to Lyles, when in fact Lyles had demanded it; (2) Lyles and McCoy had ended their business relationship on a positive note, when in fact Lyles ended the relationship due to "improper activities taking place within the partnership;" and (3) that Lyles could be counted on to serve as a positive business reference for McCoy.
 
 
 23
 The prosecution argued, and the district court agreed, that the letter sent to the DOC was relevant to the charges of securities fraud because it showed that McCoy was attempting to deceive the DOC after the DOC had issued its cease and desist order. The prosecution also argued that McCoy was using his alleged positive references from Lyles to continue to encourage investors to invest in his company.
 
 
 24
 After ruling that the evidence was relevant, the district court also considered and rejected McCoy's Rule 403 argument:
 
 
 25
 Well, the difficulty is this, Mr. Sciandra. If Mr. McCoy hadn't used those facts to try to influence the Department of Corporations, I would quite agree with you. But he's the one who puts it in issue by writing this letter to Mr. Bickford. And so I think under the circumstances that it's not going to be too prejudicial, its not going to be too time-consuming or confusing, and it is relevant, since the impression here is that we have a wonderful relationship with Lyles Diversified and due to our good faith, they have continued to be a positive source for referral business. If that's true, then both sides should be able to prove it. If it's not true, then the jury should have the truth.
 
 
 26
 After carefully reviewing the record, we conclude that the district court did not abuse its discretion in ruling that Lyles' testimony was relevant to the allegations of securities fraud, nor in rejecting McCoy's Rule 403 challenge.
 
 
 27
 In addition, although the government does not directly discuss McCoy's argument that the evidence was improper character evidence under Rule 404(b), it appears that the evidence was offered to prove that McCoy attempted to deceive the California DOC, an issue relevant to the charges of securities fraud, and was not introduced in order to prove conduct in conformity with McCoy's character. Accordingly, we also reject McCoy's Rule 404(b) challenge.
 
 III
 
 28
 Dille next argues that the district court erred by allowing the government to introduce testimony by Dille's victims regarding (1) the amount of their losses and (2) the impact of the losses on their lives. Dille argues that the evidence in both categories was irrelevant to proving the mail fraud and securities fraud violations, and that even if the evidence was relevant, the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.
 
 
 29
 As became clear during oral argument, Dille did not object to the introduction of this evidence in the district court. We therefore review for plain error. In order to prevail, Dille must show that (1) an error occurred; (2) the error was plain, clear or obvious; and (3) the error prejudiced his "substantial rights" in that it "affected the outcome of the proceedings." People of Territory of Guam v. Cruz, 70 F.3d 1090, 1092 n. 2 (9th Cir.1995) (citing United States v. Olano, 113 S.Ct. 1770, 1776-78 (1993)). If Dille is able to meet his burden on these three points, we have authority to reverse his conviction; however, we should exercise our discretion to do so only if the error seriously affected the fairness, integrity or public reputation of the proceedings. Id.
 
 
 30
 In light of the standard of review, we affirm on this issue. Even if the admission of the evidence constituted a clear, plain or obvious error, we conclude, in light of the evidence of guilt in the record, that Dille has failed to establish that admission of the evidence "affected the outcome of the proceedings." We therefore lack authority to reverse his conviction on this basis.
 
 IV
 
 31
 Dille next argues that the prosecutor improperly implied during closing argument that Dille had conducted an illegal credit check on McCoy before entering into business with McCoy. Dille's point appears to be that because running such a check allegedly would have been illegal, and because he therefore wouldn't have run the check, it was improper for the government to infer that Dille was aware of McCoy's background when he went into business with him. Once again, Dille did not object to this comment during trial. We therefore review Dille's argument regarding this alleged prosecutorial misconduct for plain error. United States v. Hinton, 31 F.3d 817, 824 (9th Cir.1994), cert. denied, 115 S.Ct. 773 (1995).
 
 
 32
 The comment to which Dille objects is the following:
 
 
 33
 Do you seriously believe that Fred Dille, knowing that Michael McCoy was a customer of Glendale Federal Bank, do you believe that Fred Dille didn't run a credit check on him? Wouldn't that have been foolish? You are going to toss your hat into the ring with this man who owns a business, you are going to change your career, you are going to go in a new direction, you are going to do a different thing, and you don't even bother to check him out like you check out somebody applying for a loan? That's totally noncredible.
 
 
 34
 In light of the apparent lack of evidence in the record to support the prosecutor's suggestion that Dille had run a credit check on McCoy, Dille has probably demonstrated that the prosecutor's comment constituted a plain, clear or obvious error. In addition, the error may have slightly undermined Dille's case, because the indictment apparently charged that Dille deliberately kept information about McCoy's past from investors, and the government therefore had to prove that Dille was aware of McCoy's past. However, Dille has simply not demonstrated that this isolated comment "affected the outcome of the proceedings." Cruz, 70 F.3d at 1092 n. 2. Accordingly, we reject his argument.
 
 V
 
 35
 Dille next argues that the district court erred when it denied, without an evidentiary hearing, his motion for a new trial based on potential juror misconduct. Dille's argument is based on the fact that Dille learned after trial that one of the jurors may have known Dille's family, a fact which the juror did not reveal during voir dire. We review the district court's ruling on a motion for a new trial based on juror misconduct for abuse of discretion. United States v. Edmond, 43 F.3d 472, 473 (9th Cir.1994). Similarly, the court's decision whether to hold an evidentiary hearing on a new trial motion is reviewed for an abuse of discretion. Hard v. Burlington Northern R.R. Co., 870 F.2d 1454, 1462 (9th Cir.1989).
 
 
 36
 In McDonough Power Equipment Inc. v. Greenwood, 464 U.S. 548 (1984), the Supreme Court established a two-part test to be applied in assessing whether a juror's allegedly improper responses to questions during voir dire justify a new trial:
 
 
 37
 We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial.
 
 
 38
 Id. at 556. This court has applied the McDonough test in the context of criminal trials. See, e.g., United States v. Aguon, 851 F.2d 1158, 1170 (9th Cir.1988) (en banc); United States v. Nickell, 883 F.2d 824, 827 (9th Cir.1989).
 
 
 39
 Dille has failed to meet his burden on the first prong of this test, because he has presented no evidence showing that the juror in question failed to answer honestly a material question on voir dire. Dille's entire argument is premised on the allegation that the juror, Michael Charlon, allegedly "either knew, or knew of, Mr. Dille;" however, Dille has provided no evidence on this point. In particular, Dille has not provided a fact affidavit from either Charlon or Dille stating that they recognized each other during the trial. In addition, as the government points out, Dille did not mention during voir dire that he knew Mr. Charlon, thus suggesting that the two did not in fact know each other. In short, Dille has not met his burden under McDonough.
 
 
 40
 Moreover, although Dille has alleged that he has been denied his right to an "impartial" jury, he has completely failed to explain why the mere fact that the juror may have previously heard of Dille or his family would lead that juror to be "partial." Accordingly, we hold that the district court did not abuse its discretion in denying Dille's motion for an evidentiary hearing and a new trial.
 
 VI
 
 41
 Dille next argues that the district court erred by enhancing his base offense level under U.S.S.G. § 3B1.3 for abuse of a position of trust. Because the propriety of applying an abuse of trust enhancement is a mixed question of fact and law, we review the district court's ruling de novo. United States v. Ferrin, 994 F.2d 658, 665 (9th Cir.1993) (citing United States v. Hill, 915 F.2d 502 (9th Cir.1990)). We agree with Dille that the court should have not have enhanced his sentence.
 
 
 42
 Section 3B1.3 states in relevant part that "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." The commentary to the section states as follows:
 
 
 43
 "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.... This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment would not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.
 
 
 44
 Commentary to U.S.S.G. § 3B1.3 (Nov. 1995), Application Note 1.
 
 
 45
 This court's most comprehensive discussion of this provision was given in United States v. Hill, 915 F.2d 502 (9th Cir.1990). In Hill, the court reviewed the authorities and concluded that
 
 
 46
 [a] single principle emerges from these assorted authorities: the primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong. If a person is in a relationship such that any attempt by a defendant to abuse the relationship could be simply or readily noticed by the second party to the relationship, presumably the two persons have not formed a "trust" relationship. Conversely, if one party is able to take criminal advantage of the relationship without fear of ready or quick notice by the second party, the second party has clearly placed a level of trust in the first.
 
 
 47
 Id. at 506 (emphasis added). The court added that
 
 
 48
 [t]hese authorities also reveal two indicia of a position of trust. One indicium of such freedom to commit a difficult-to-detect wrong under section 3B1.3 is the inability of the trustor objectively and expediently to determine the trustee's honesty.... A second indicium of freedom to commit a difficult-to-detect wrong is the ease with which the trustee's activities can be observed.
 
 
 49
 Id. Finally, the court also clarified that "[f]or purposes of section 3B1.3, a position of trust, if any, must be established from the perspective of the victim." Id. at 506 n. 3.
 
 
 50
 The district court ruled that Dille abused his position as president of MMA by using his reputation as a professional, trustworthy banker to convince investors to invest in what became, in essence, a Ponzi scheme. The court noted that
 
 
 51
 You were a president of the corporation. The investors believed in you. They relied on you. They trusted you. We had many, many victims who said that [the] only reason they parted with their money, and [gave] it [to the] business, was because of you.
 
 
 52
 We conclude that the court's conclusion was erroneous. The court appears to have based the enhancement in this case on its conclusion that the victims "trusted" Dille. However, it does not appear that the court explicitly ruled that the victims were unable "objectively and expediently to determine [Dille's] honesty," nor did the court specifically discuss the question of the "ease with which [Dille's] activities [could] be observed." In addition, we are not persuaded that the government has established that Dille, solely because of his position as president of MMA, was in a position to "commit a difficult-to-detect wrong." Accordingly, we reverse on this issue, and remand Dille's case for resentencing with instructions to the district court not to enhance Dille's sentence under U.S.S.G. § 3B1.3.
 
 VII
 
 53
 For the foregoing reasons, we AFFIRM the appellants' convictions, and REMAND Dille's case for resentencing.[4]
 
 
 54
 AFFIRMED IN SUBSTANTIAL PART; REMANDED IN PART.
 
 
 
 *
 The Honorable Marilyn L. Huff, United States District Judge for the Southern District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit R. 36-3
 
 
 [1]
 McCoy is African-American; Dille is Caucasian. Dille's standing to object to the alleged exclusion of African-Americans from the jury is based on the Supreme Court's statement that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same races." Powers v. Ohio, 499 U.S. 400, 402 (1991)
 
 
 [2]
 Appellants also argue that the district court erred by not allowing them to question Clark before he was excused. As the quoted portion of the transcript indicates, the district judge did in fact initially tell the defense attorneys that it would allow them an opportunity to question Clark on the subject of his hardship. However, the transcript also indicates that the court then decided to inquire further of Clark on its own, and concluded sua sponte that (1) Clark had clearly indicated that he would suffer a hardship if kept on, and (2) that it would "have not been evenhanded" for the court to force Clark to sit when the court had excused other jurors for similar reasons "on less inquiry." Appellants have failed to demonstrate that the court's actions constitute reversible error
 
 
 [3]
 McCoy also argues that the court erred by not giving a limiting instruction regarding this alleged "character" evidence. However, he apparently did not request a limiting instruction, and has thus waived his right to argue the point. Cf. United States v. Jenkins, 785 F.2d 1387, 1396 (9th Cir.), cert. denied, 479 U.S. 855 (1986)
 
 
 [4]
 The government's motion to file a second supplemental excerpt of record is hereby granted. Dille's motion for bail pending appeal is denied as moot