Filed 8/31/20  P. v. Le CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G057685 consol. w/ G058127 |
| v. | (Super. Ct. No. 13WF0315) |
| VANN LE, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Cathryn L. Rosciam, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

Vann Le appeals from a judgment after a jury convicted him of one count of petty theft and two counts of grand theft. Le argues insufficient evidence supports his theft convictions and the trial court committed three instructional errors.

As we explain below, we conclude sufficient evidence supports Le's theft convictions and his convictions cannot be aggregated into a single conviction. Additionally, there were no instructional errors. We affirm the judgment.

FACTS

In 2010, Le owned a business called Producers Exchange, Inc., which conducted business under the name of "'the3Mien.com'"" (3Mien). 3Mien sold international phone cards, provided travel services, and offered a money transfer service that allowed people to send money to family and friends in Vietnam.

In early 2010, Le entered into negotiations with Ferdinand Agpaoa, the general manager of Maniflo Money Exchange (Maniflo). Maniflo was a licensed money transmission company. Agpaoa wanted to expand Maniflo's operations into Vietnam. He was interested in partnering with Le because of Le's business connections in Vietnam.

In January 2010, Le entered into an agreement with Maniflo that allowed 3Mien to wire money to Vietnam as Maniflo's authorized agent. Based on the agreement, one of Le's investors deposited $300,000 into Maniflo's bank account. When a customer would use 3Mien to transfer money, she would fill out a form providing her name and address, the beneficiary's name and address, and the amount of money she wanted to send. A 3Mien employee would show the customer the exchange rate, and then have the customer sign the form to verify the information. The employee would accept the payment and enter the information into Maniflo's computer system. The system would generate a receipt for the customer. Maniflo's paying agents in Vietnam would then be able to access the information from the system and complete the

2

transaction. The next day, a 3Mien employee would deposit the money it received for the wire transfer into Maniflo's bank account. Maniflo would verify the amount deposited matched the order that 3Mien processed. The $300,000 deposit was made so the beneficiaries could receive their money in a timely fashion because it took Maniflo three to five days to verify the deposits. Maniflo's designated paying agents would then use the funds in that account to pay the money transmissions, and Maniflo would replenish the account with money received from 3Mien later.

In February 2010, Maniflo was having difficulties with 3Mien's deposits. The deposits were often delayed or did not always match the prior day's transactions. Agpaoa contacted Le about the delays and discrepancies. Le assured Agpaoa that he would reconcile the deposits. Le deposited money into the account, but it did not cover the shortage. Agpaoa met with Le to discuss the shortage, and Le again assured Agpaoa that he would cover the shortage. Agpaoa trusted Le to keep his word. On February 18 and March 4, 2010, Agpaoa sent letters to Le suspending 3Mien's operations. However, after both instances, he reinstated its operations when Le assured him that he would reconcile the deposits. By the end of February, 3Mien was $200,000 short on its deposits. Agpaoa did not believe it was due to any fault of Maniflo's system.

On March 10, 2010, Agpaoa sent a letter to Le terminating 3Mien's agency relationship with Maniflo. Agpaoa blocked 3Mien from using its user name and password so it could no longer access Maniflo's system. Agpaoa could not remember how much of the $300,000 was left in the account when he terminated the relationship with 3Mien.

Around the same time, Oscar Lumen of the California Department of Business Oversight investigated Le's status as a licensee for money transmission after

3

receiving complaints about 3Mien. Lumen sent a cease and desist letter to Le. Lumen learned 3Mien was working under Maniflo during this time.

In July 2010, Lumen learned 3Mien was no longer affiliated with Maniflo. He sent another cease and desist letter to Le telling him to stop accepting money for transmission to Vietnam.

Between May 19, 2010, and July 12, 2010, nine people went to 3Mien and arranged for it to send money to Vietnam. Seven of these people tried to contact 3Mien after their transfers, but they were unable to contact any employee. One person went to 3Mien and took photographs. The first time he went, there was a sign saying the business was temporarily closed and would reopen. He went back numerous times to find the store still closed.

In June 2010, Mary Dang contacted 3Mien to become involved in the money transmission business. She spoke to a female employee about becoming an agent for 3Mien. 3Mien sent her an application, which she filled out, signed, and dated on June 21, 2010. Dang wrote "This is the contract" on the application and faxed it on July 30, 2010. No one from 3Mien signed the document.

The application contained written instructions in English and Vietnamese. Dang spoke and understood both languages. The application asked for the applicant's identification, social security number, business license, etc., which Dang provided. The application explained 3Mien would invoice the applicant twice a month, on the 1st and 16th, and provided instructions, including the account number, to deposit money into 3Mien's bank account. After she completed the application, Dang believed she was authorized to accept money for wire transfers on behalf of 3Mien. Dang had spoken to one female employee. She had no other contact with any other 3Mien employee. Dang did not know Le, never met him, and had no personal contact with him.

4

On June 23, 2010, Dang deposited $500 into 3Mien's bank account to purchase a phone card. She faxed a copy of the deposit slip to 3Mien and it provided her with a personal identification number (PIN) number for the phone card. Dang tried to use the PIN number, but it did not work. On July 13 and 14, 2010, Dang accepted $4,900 in cash from four customers to wire to Vietnam. Le Suong gave Dang $700, Thuy Ton gave Dang $200, Calvin Nguyen (Calvin) gave Dang $2,000, and Minh Nguyen (Minh) gave Dang $2,000. Dang filled out forms for each customer, but the customers did not sign the forms. Dang deposited the cash into 3Mien's bank account. She obtained three receipts for the deposits, one for $202, one for $706, and one for $4,032. She faxed the deposit slips to 3Mien.

3Mien never gave Dang receipts for these deposits. She tried calling 3Mien multiple times to check the status of the deposits, but she was unable to speak with anyone. Dang e-mailed 3Mien and never received a reply. In response to customer complaints, Dang refunded the money. She personally wired $700 for Suong and $200 for Ton. She paid Calvin and Minh their $4,000 in installments.

In July 2010, Detective Brian Marlow opened an investigation into 3Mien following several complaints from residents. Marlow executed search warrants and obtained Le's personal and business records from three banks, Chase, Wells Fargo, and Bank of America. The 3Mien Bank of America account showed Dang's four deposits, one for the phone card and three for the wire transfers. Except for a wire transfer on July 13, 2010, to Vietnam Data Communications, the bank records did not show any other outgoing wire transfers following Dang's deposits. In the week following Dang's deposits, about $15,000 was withdrawn from the account. At the end of the week, the ending balance was negative $337.56.

In July 2010, Marlow spoke to Le. Le said many of his resellers defaulted on payments to him, which put him into financial hardship. Le told Marlow that he might have to file for bankruptcy.

An arrest warrant was issued for Le on February 13, 2013. Le was arrested on December 16, 2015.

An information charged Le with the following: grand theft of Dang (Pen. Code, § 487, subd. (a),[1] count 1); grand theft of Calvin (§ 487, subd. (a), count 2); grand theft of Minh (§ 487, subd. (a), count 3); and engaging in unlicensed business of money transmission (Fin. Code, §§ 1823, 1800.3, subd. (a), count 4).[2]

At trial, Dang testified that from the end of June through the middle of July 2010, she completed around 10 transactions with 3Mien. At the close of evidence, the trial court denied Le's section 1118.1 motion for judgment of acquittal.

During closing argument, Le argued the prosecution failed its burden to prove Le intended to defraud Dang. Le argued the prosecution failed to provide better or stronger evidence Dang had a "contract" with 3Mien and a relationship of trust.

The trial court instructed the jury on the elements of embezzlement (CALCRIM No. 1806), refused to instruct on Evidence Code section 412, and did not instruct sua sponte on the mistake of fact defense (CALCRIM No. 3406).

The jury found Le guilty of one count of petty theft as to count 1, and two counts of grand theft as to counts 2 and 3, and acquitted him on count 4. The trial court sentenced Le to six months of jail with three years of formal probation. The court ordered him to pay Dang $4,500 in restitution.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

[2] Financial Code sections 1823 and 1800.3 were repealed. (Stats. 2010, ch. 612, § 1.)

6

DISCUSSION

## I. *Counts 1-3*

### A. *Sufficiency of the Evidence*

Le argues insufficient evidence supports his embezzlement convictions because there was no evidence of a relationship of trust or intent to defraud. Neither contention has merit.

"'When a defendant challenges the sufficiency of the evidence, "'[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" [Citations.] "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]" [Citation.] We "''presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" [Citation.]" [Citation.]' [Citation.]" (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 749 (*Selivanov*).)

"'"Embezzlement is the fraudulent appropriation of property by a person to whom it has been [e]ntrusted." (§ 503.) The elements of embezzlement are "1. An owner entrusted his/her property to the defendant; 2. The owner did so because he/she trusted the defendant; 3. The defendant fraudulently converted that property for his/her own benefit; [and] 4. When the defendant converted the property, he/she intended to deprive the owner of its use." [Citation.]' [Citation.]" (*Selivanov*, *supra*, 5 Cal.App.5th at p. 764.)

### 1. *Relationship of Trust*

Le contends there was no evidence of a relationship of trust. We disagree.

As to the issue of a relationship of trust or confidence, it is clear that regardless of the term used, there must be a relationship of trust between the parties "similar to a fiduciary relationship." (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1845 (*Wooten*).) This relationship provides a basis for the owner to voluntarily provide their property to the defendant otherwise, the lack of consent would make the offense, larceny, not embezzlement. (2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 31, pp. 54-55.)

Here, there was sufficient evidence to support the conclusion there was a relationship of trust between Dang and Le. The record includes evidence a 3Mien employee provided Dang with an agent application form and Dang completed the application on June 21, 2010. Dang filled out the form and wrote "This is the contract" on the application. Although no one from 3Mien signed the application, the surrounding circumstances establish there was a relationship of trust. As part of the application process, 3Mien provided Dang its bank account information to make deposits. From this evidence, the jury could reasonably conclude 3Mien created a business relationship with Dang and trusted her to make deposits into their bank account. Additionally, Dang testified that before the transactions at issue here, she had completed 10 transactions with 3Mien. This establishes Dang trusted the 3Mien because she voluntarily provided 3Mien with her, and her client's, property.

Le claims the prosecution failed to provide corroborating evidence of these 10 transactions. However, Dang's testimony regarding the 10 prior transactions was sufficient to reasonably conclude there was a relationship of trust between Dang and Le. The testimony of one witness is sufficient to support a conviction. (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 845.)

8

Le claims there was no evidence he and Dang had a personal relationship or even met. However, that is not the test. There must be a relationship of trust between the parties similar to that of a "fiduciary relationship." (*Wooten*, *supra*, 44 Cal.App.4th at p. 1845.) The evidence demonstrated this kind of relationship existed here.

*2. Intent to Defraud*

Le asserts there was no evidence of an intent to defraud. Again, we disagree.

"'"The intent essential to embezzlement is the intent to fraudulently appropriate the property to a use and purpose other than that for which it was entrusted, in other words, the intent to deprive the owner of his property . . . ."' [Citation.] 'It is well established that intent to defraud may be inferred from the circumstances surrounding the transaction in question.' [Citations.]" (*Selivanov*, *supra*, 5 Cal.App.5th at p. 750.)

Here, there was sufficient evidence for the jury to reasonably conclude Le had the intent to defraud Dang, Calvin, and Minh. The record includes evidence Dang made a series of deposits on July 13 and 14, 2010. On July 13, Le completed an outgoing money transfer to Vietnam Data Communications. By the end of the week, Le had withdrawn $15,000 leaving the bank account with a negative balance. The timing of Le's transfers from the account on the day of Dang's deposit to the following week supports the conclusion Le was aware of her deposits in the bank account and transferred that money for his own purposes. Additionally, Le and his business, 3Mien, were having financial troubles. Le told Marlow that he would possibly have to file for bankruptcy because others had taken money from him. Finally, evidence Le fled by closing his business and not returning customers' telephone calls demonstrated a consciousness of guilt. The timing of Le's transfers, Le's financial difficulties, and Le's flight are strong

9

circumstantial evidence to support a finding he intended to defraud Dang, Calvin, and Minh.

Le argues there was no evidence of an intent to defraud Dang because 3Mien was closed and he did not know Dang had deposited money into 3Mien's bank account. Le had access and ownership of 3Mien's bank account. 3Mien operates a money transfer service done through electronic transfers. Long gone are the days where one has to enter a brick and mortar business to conduct financial transactions. To conclude Le was unaware of Dang's deposits into the bank account he has ownership over defies common sense. Le essentially asks us to reweigh the evidence. That we cannot do. (*People v. Jones* (2013) 57 Cal.4th 899, 963 [defer to trier of fact and not substitute our judgment].)

Thus, the record contained sufficient evidence of a relationship of trust and an intent to defraud. We conclude, examining the record and drawing all reasonable inferences therefrom in favor of the judgment, there was sufficient evidence to support Le's convictions of petty theft and grand theft under an embezzlement theory.

*B. Aggregate*

Le argues that if we conclude there was sufficient evidence to support his convictions for embezzlement, then we should aggregate his three offenses into a single count of grand theft. We disagree.

In *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*), the California Supreme Court addressed the issue of aggregation of theft offenses. In that case, defendant fraudulently told the welfare office that a man she had been living with had left her home. (*Id.* at pp. 515-516.) Defendant received a series of welfare payments she was not entitled to receive and was convicted of one count of grand theft. (*Ibid.*) The *Bailey* court addressed the issue of whether defendant was guilty of one count of grand theft or a

10

series of petty thefts.  (*Id.* at p. 518.)  The court upheld the single conviction.  They concluded a series of separate thefts from the same victim could, in certain circumstances, be aggregated into a single count of grand theft.  (*Id.* at p. 519.)  The relevant test was whether there was "only one intention, one general impulse, and one plan."  (*Ibid.*)

The California Supreme Court clarified the issue in *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*).  In that case, defendant was a manager of a motorcycle dealership.  (*Id.* at pp. 734-735.)  A jury convicted him of 20 separate counts of grand theft for 20 separate fraudulent transactions.  (*Ibid*.)  The *Whitmer* court analyzed *Bailey* and explained it only concerned a single fraudulent act followed by a series of payments.  (*Id.* at p. 740.)  It added the cases *Bailey* distinguished involved separate and distinct fraudulent acts.  (*Ibid*.)  The *Whitmer* court held "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme."  (*Id.* at p. 741.)  The court opined defendant could be convicted of 20 separate counts of grand theft—despite that all the thefts were part of a single plan—because he committed a series of separate and distinct fraudulent acts, and each act had a separate intent to defraud.  (*Id.* at pp. 740-741.)  The court explained a "thief should not receive a "'felony discount'" if the thefts are separate and distinct even if they are similar."  (*Id.* at pp. 740-741.)  The court did state it was not overruling *Bailey*.  (*Id.* at p. 741.)  But because *Bailey*'s long history of application, the court did not apply their holding to defendant and ruled the holding would only be applied prospectively.  (*Id.* at p. 742.)

Relying on *Bailey* and *Whitmer*, Le argues his convictions should be aggregated because he did not commit separate and distinct fraudulent acts with separate intents.  However, *Whitmer* does not apply here because the offenses took place in 2010.

11

*Whitmer*, decided in 2014, held its ruling only applied prospectively due to the long history of *Bailey*'s application. (*Whitmer*, *supra*, 59 Cal.4th at p. 742.) Thus, *Bailey* applies here. Unfortunately, neither Le nor the Attorney General acknowledge the claim must be analyzed under pre-*Whitmer* doctrine as stated in *Bailey* and its progeny.

*Bailey* involved a single misrepresentation with multiple payments and only one victim. Some appellate courts have held *Bailey* does not apply when there are multiple victims. (See, e.g., *People v. Tabb* (2009) 170 Cal.App.4th 1142, 1149 [stating *Bailey* generally limited to thefts involving single victim]; *In re David D.* (1997) 52 Cal.App.4th 304, 310 ["one limitation of the *Bailey* doctrine is its inapplicability to offenses involving multiple victims"]; *People v. Garcia* (1990) 224 Cal.App.3d 297, 308 [*Bailey* did not apply where multiple victims].) Other appellate courts have applied *Bailey* to multiple victims. (*People v. Carrasco* (2012) 209 Cal.App.4th 715, 717, 720 [where defendant commits multiple acts of vandalism pursuant to single plan, fact damaged property owned by more than one victim does not preclude aggregation]; *In re Arthur V.* (2008) 166 Cal.App.4th 61, 68-69, fn. 4) [in vandalism case, existence of multiple victims does not preclude aggregation under *Bailey*]; *People v. Brooks* (1985) 166 Cal.App.3d 24, 31) [applying *Bailey* to multiple thefts from single fund to which multiple victims contributed].)[3]

In *Whitmer*, the court said "[t]he *Bailey* rule must be interpreted in light of its facts." (*Whitmer*, *supra*, 59 Cal.4th at p. 740.) *Bailey* is inapposite as it concerned one victim. Here, there were multiple victims—Dang, Calvin, and Minh—with multiple thefts of property.

Le claims counts 1-3 should be aggregated because the prosecutor aggregated three victims in count 1. The prosecutor's decision concerned reaching the

---

[3] In *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1518, the court noted *Whitmer* undermined the holdings in these cases.

12

$950 threshold for grand theft, a matter of prosecutorial discretion. (*People v. Valli* (2010) 187 Cal.App.4th 786, 801 [decision as to proper charges matter of prosecutorial discretion].)  That decision does not mean Le could not legally be convicted of three theft offenses.  Additionally, he claims counts 2 and 3 should be aggregated because Dang used one deposit slip for Calvin and Minh.  The fact Dang combined the money from two victims to make one deposit does not change our analysis because there were two victims.

We conclude Le's convictions for grand theft cannot be aggregated into a single count.  He was properly convicted of three counts of embezzlement.

## II.  Jury Instructions

Le raises three instructional claims.  We will address each in turn.

### A.  CALCRIM No. 1806

Le contends the standard embezzlement instruction, CALCRIM No. 1806, did not properly define embezzlement.  Not so.

### 1.  Background

During a discussion about CALCRIM No. 1806, "Theft by Embezzlement," Le's counsel objected to the intent element, requesting language defendant intended to "permanently deprive" the owner of property.  The prosecutor did not object to the modification.  The trial court instructed the jury as follows:  "'The defendant is charged in [c]ounts 1, 2, and 3 with grand theft by embezzlement in violation of . . . section 503. [¶] To prove that the defendant is guilty of this crime, the [p]eople must prove that:  [¶] 1. An owner or the owner's agent entrusted his or her property to the defendant; [¶] 2. The owner or owner's agent did so because he or she trusted the defendant; [¶] 3. The defendant fraudulently converted that property for his own benefit; [¶] [and] [¶] 4. When the defendant converted the property, he intended to permanently deprive the owner of it.

13

[¶] A person acts fraudulently when he takes undue advantage of another person or causes a loss to that person by breaching a duty, trust or confidence." Le did not request CALJIC No. 14.07[4] or request additional modification.

*2. Applicable Law*

"The trial court has a sua sponte duty to instruct the jury on all essential elements of a charged offense. [Citation.] . . . [Citation.] All criminal defendants have the right to a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' [Citations.]" (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) We review whether a jury instruction fully and correctly states the law de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218 (*Posey*).)

*3. Analysis*

Le contends CALCRIM No. 1806 did not properly define embezzlement because it omitted the elements of a relationship of trust and that the defendant accepted the property entrusted to him, and it misdefined "fraudulently." Le does not claim the trial court should have instructed the jury with CALJIC No. 14.07. Instead, he asserts CALJIC No. 14.07 is helpful because it includes language there was a relationship of trust and that defendant accept the property, which CALCRIM No. 1806 omits.

There was no instructional error because CALCRIM No. 1806 is an accurate statement of the law on embezzlement. (*People v. Fenderson* (2010) 188 Cal.App.4th 625, 636-637 [providing elements of embezzlement citing CALCRIM No. 1806].) Le argues CALCRIM No. 1806 omits the finding there was a relationship of trust between the defendant and the property owner. However, CALCRIM No. 1806

---

[4] CALJIC No. 14.07, "Theft by Embezzlement—Defined," states as follows: "1. A relation of trust and confidence existed between two persons; [¶] 2. Pursuant to that relationship one of those persons accepted property entrusted to him by the other person; and [¶] 3. With the specific intent to deprive the other person of his property, the person appropriated or converted it to his own use or purpose."

14

required the jury to find a property owner must *entrust* his property to the defendant and the property owner did so because she *trusted* the defendant. Additionally, the instruction stated "[a] person acts fraudulently when he takes undue advantage of another person or causes a loss to that person by breaching a duty, *trust* or confidence." (Italics added.) CALCRIM No. 1806 required the defendant to gain access to the property through some relationship of trust. The relationship of trust element was not omitted.

Le also argues CALCRIM No. 1806 was inadequate because it did not require the defendant to accept the property entrusted to him by the property owner. CALCRIM No. 1806 required the defendant to have converted the property for his own use and when he did, he intended to permanently deprive the owner of its use. If the defendant was found to have intended to convert the property for his own benefit, then it is clear the defendant did in fact accept that property. The acceptance of property is a logical conclusion when the defendant converts the property for his own use. The acceptance of property requirement was not omitted.

Finally, Le argues the trial court improperly defined the term "fraudulently" because it allowed the jury to conclude he acted fraudulently even if it concluded his conversion of property was negligent and not intentional. Le misrepresents the instruction. The term "fraudulently" seeks to help jurors understand the third element of embezzlement. The fourth element of embezzlement included the requirement the defendant *intend* to deprive the property owner. CALCRIM No. 1806 did not allow the jury to convict Le based on a finding he was negligent.

If Le wanted further modification or a pinpoint instruction, he should have requested it. The trial court was not required to give pinpoint instructions sua sponte. (*People v. Anderson* (2011) 51 Cal.4th 989, 996-997 (*Anderson*) [pinpoint instructions

15

only given upon request] (*Anderson*).)  Thus, the trial court properly instructed the jury with CALCRIM No. 1806.

*B. CALCRIM No. 3406*

Le argues the trial court erred in failing to instruct the jury sua sponte on the mistake of fact defense.  We disagree.

The trial court has a sua sponte duty to instruct on the ""''"general principles of law relevant to the issues raised by the evidence."''" (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)  This includes a sua sponte obligation to instruct on a specific defense, ""''"if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such defense and the defense is not inconsistent with the defendant's theory of the case."'' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 424.)  Substantial evidence means evidence of a defense, which, if believed, would be sufficient for the jury to find a reasonable doubt as to the defendant's guilt. (*People v. Salas* (2006) 37 Cal.4th 967, 982.)

The mistake of fact defense[5] provides a person cannot be convicted of a crime if they acted "under an ignorance of mistake of fact, which disproves any criminal intent." (§ 26, class Three.)  The defense applies, "when the defendant holds a mistaken belief in a fact or set of circumstances, which, if existent or true, would render the

---

[5] CALCRIM No. 3406 states as follows:  "The defendant is not guilty of [insert crime[s]] if (he/she) did not have the intent or mental state required to commit the crime because (he/she) [reasonably] did not know a fact or [reasonably and] mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as (he/she) [reasonably] believed them to be, (he/she) did not commit [insert crime[s]]. [¶] If you find that the defendant believed that [insert alleged mistaken facts] [and if you find that belief was reasonable], (he/she) did not have the specific intent or mental state required for [insert crime[s]]. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for [insert crime[s]], you must find (him/her) not guilty of (that crime/those crimes)."

16

defendant's otherwise criminal conduct lawful. [Citations.]" (*People v. Lawson* (2013) 215 Cal.App.4th 108, 111 (*Lawson*).) We review a claim of instructional error de novo. (*Posey, supra,* 32 Cal.4th at p. 218.)

In *Lawson*, defendant was convicted of theft for walking out of a store with a sweatshirt on his shoulder that he had not paid for. (*Lawson*, *supra*, 215 Cal.App.4th at pp. 111-112.) On appeal, defendant argued the trial court erred by failing to instruct the jury sua sponte on the mistake of fact defense. (*Id*. at p. 113.) The *Lawson* court relied on *Anderson, supra,* 51 Cal.4th at page 998, which said the defense of accident serves only to negate the mental state element of the charged crime, and as such the defense is not the type of defense that invokes the court's sua sponte instructional duties. (*Id*. at p. 998.) The *Lawson* court held the *Anderson* rationale applied with equal force to a mistake of fact defense because it applies to any defense that operates only to negate the mental state element of the crime. (*Lawson*, *supra*, 215 Cal.App.4th at p. 117.) The court concluded that if the jury is completely and accurately instructed on the mental element of the charged crime, then the court's duty to instruct on the defense of mistake of fact is not required sua sponte. (*Id.* at p. 118.)

Here, Le argues the trial court should have instructed the jury sua sponte with the mistake of fact defense because a reasonable juror could have concluded he was unaware Dang deposited $5,000 into 3Mien's bank account. Specifically, Le asserts he did not possess the intent to defraud Dang. Le's defense sought to negate the mental state element of embezzlement. Thus, it was not the type of defense that invokes the court's sua sponte instructional duties. Additionally, as we explain above, the trial court properly instructed the jury with CALCRIM No. 1806, which included the proper mental element of embezzlement. The trial court was not required to instruct sua sponte on the defense of mistake of fact. There was no error.

## C. Evidence Code section 412

Le contends the trial court erred by denying his request to instruct the jury on Evidence Code section 412. Not so.

### 1. Background

Le requested the trial court instruct the jury with Evidence Code section 412, which provides: "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." Le requested the instruction because the prosecution had Agpaoa and Dang testify with little to no documentation regarding their claims. As to Dang, Le's counsel stated, "Mary Dang had the power to bring in -- she said she had all of the documents. Did she bring in an agency statement between her and . . . Le? Or anyone? No, she did not. She had the power to do that, to bring those things in, and chose, instead, this flimsy piece of paper, four documents, that she said was a contract, that wasn't even signed by anyone, other than herself. [¶] And it says, in her own handwriting, 'This is a contract.' [¶] That's what she is producing, to lead jurors to believe that she was an agent of . . . Le. And that is supposed to be good-faith belief in what she's saying, when she had the power to do something else? [¶] So I think [Evidence Code section] 412 relates to what has come in, in regards to, and what hasn't come in." The court concluded the instruction was argumentative and denied the request. The court said Le could make the argument to the jury.

During closing argument, Le's counsel read Evidence Code section 412 to the jury. Le explained there was no signed agreement between Dang and Le, and that the "contract" Dang referred to was an application no one from 3Mien signed. On rebuttal, the prosecutor argued Evidence Code section 412 was not part of the instructions.

*2. Applicable Law*

In *People v. Simms* (1970) 10 Cal.App.3d 299, 312-313, defendant was charged with robbery. Defendant requested the trial court instruct the jury with Evidence Code section 412 to emphasize there was no evidence to corroborate the victim's claimed injuries to his neck. (*Id.* at p. 312.) The court rejected the request for this instruction because the victim's injuries were not material to the robbery charge and there was ample evidence the victim was robbed under threat of force, making the evidence of actual force immaterial. (*Ibid.*) Additionally, the court explained that for the Evidence Code section 412 rule to apply, it must be shown the prosecution was in fact in possession of better and stronger evidence. (*Id.* at p. 313.) The court held defendant failed to show the prosecution had any stronger evidence of the victim's injuries. (*Ibid.*) We review de novo a trial court's denial of a defendant's requested instruction. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1089, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

*3. Analysis*

At trial, Le argued the trial court should instruct the jury with Evidence Code section 412 because the prosecutor possessed better and stronger evidence regarding an agency agreement between Dang and Le. However, on appeal, Le argues the prosecutor possessed better and stronger evidence related to Dang's prior business transactions in the form of bank records. Le did not argue this claim in his offer of proof in the trial court as support for instructing on Evidence Code section 412. "'A party is not permitted to change his [or her] position and adopt a new and different theory on appeal.'" (*In re Marriage of Eben-King & King* (2000) 80 Cal.App.4th 92, 110.)

Nevertheless, to the extent Le argues the prosecutor failed to present better and stronger evidence relating to Dang's contractual relationship with 3Mien, her claim is

19

meritless.  The weaker and less satisfactory evidence presented was material to the embezzlement charges.  The agent application and Dang's testimony about the agent application directly related to the relationship of trust element of embezzlement.  However, Le failed to provide any evidence the prosecution possessed any better or stronger evidence related to an agency application or a fully executed contract between he and Dang.  Le presented no witnesses or documentation to support this claim.  Such an instruction "may be given by the court to the jury on all proper occasions, but that in criminal cases the proper occasions are so few and the improper occasions are so many that it would be better if the instruction were given rarely, if at all.  [Citations.]" (*People v. Adame* (1959) 169 Cal.App.2d 587, 600.)  Thus, the trial court did not err by denying Le's request to instruct the jury with Evidence Code section 412.

*D.  Cumulative Error*

Le raised three instructional claims on appeal and argued their cumulative effect of the prejudice requires reversal.  There was no instructional error, and thus his claim is meritless.

DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:


IKOLA, J.


GOETHALS, J.

20